The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

Robert Eliot **HARLAN**, Defendant–Appellant.

No. 95SA298.

Supreme Court of Colorado, En Banc.

March 27, 2000.

As Modified on Denial of Rehearing Sept. 11, 2000.*

* Justice BENDER and Justice COATS do not participate.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, John Daniel Dailey, Deputy Attorney General, Paul R. Wolff, Assistant Attorney General, Paul Koehler, Assistant Attorney General, Criminal Enforcement Section, Capital Crimes Unit, Denver, Colorado, Robert S. Grant, Special Assistant Attorney General, Steven L. Bernard, Special Assistant Attorney General, Denver, Colorado, Attorneys for Plaintiff–Appellee.

David Kaplan, Colorado State Public Defender Kathleen A. Lord, Deputy State Public Defender Terry L. Brake, Deputy State Public Defender Denver, Colorado Attorneys for Defendant–Appellant.

Justice MARTINEZ delivered the Opinion of the Court.

*Table of Contents* **

I. FACTS AND PROCEDURAL HISTORY ................................... 458

II. PRETRIAL ISSUES ............................................. 459
 A. Voir Dire ............................................... 459
 B. Venue .................................................. 468

III. GUILT PHASE ISSUES .......................................... 470
 A. Instruction on Affirmative Defense of Intoxication ........................ 470
 B. Specific Intent Element of First Degree Murder .......................... 474
 C. Asportation Element of Second Degree Kidnapping ....................... 476
 D. Attempted Murder of Maloney ......................................... 478

IV. SENTENCING PHASE ISSUES .......................................... 480
 A. Pretrial Discovery of Harlan's Expert Witnesses......................... 480
 B. Aggravating Factors .............................................. 482
 C. *Dunlap* Issues ................................................. 493

V. INDEPENDENT REVIEW ............................................. 498
 A. Appropriateness................................................. 498
 B. Arbitrariness ................................................... 499

VI. DIRECTIONS ON REMAND ........................................... 501
VII. APPENDIX ...................................................... 501

A jury found defendant Robert Harlan guilty of the kidnap, attempted first degree murder, and first degree murder of Rhonda Maloney, and the attempted murder of Jaquie Creazzo. Following a sentencing hearing, the jury sentenced the defendant to death. In addition, the trial court imposed three forty-eight-year consecutive sentences on the attempted murder and kidnapping verdicts. The defendant appeals under section 16–11–103(6), 6 C.R.S. (1999),[1] raising pretrial, guilt phase, and sentencing phase claims of error. We conclude that none of these claims merits reversal of the death sentence.

## I. FACTS AND PROCEDURAL HISTORY

On February 12, 1994, at approximately 2:00 a.m., Rhonda Maloney (Maloney) finished her shift at Harrah's Casino in Central City. She took a shuttle bus to her car, which was in the Golden bus station parking lot, arriving there between 3:00 and 3:30 a.m. At approximately 5:45 a.m., Jaquie Creazzo (Creazzo) was driving eastbound on I–76. Taking the ramp onto northbound I–25, Creazzo saw two cars parked on the side of the highway; she slowed down to see if there was a problem or if there had been an accident. Maloney got out of the passenger side of one of the cars and drew Creazzo's attention to her. Creazzo stopped her car slightly past Maloney, and, as Creazzo was backing up, Maloney jumped into the car.

Maloney and Creazzo drove northbound on I–25. Robert Harlan (Harlan) began to pursue them in one of the cars that had been parked by the road. Maloney told Creazzo that she needed help to escape from a man with a gun who was going to kill her and that he had raped her for two hours.[2]

As Harlan pursued Creazzo and Maloney, his car drew up alongside Creazzo's and Harlan fired several shots into the car. Several bullets hit Creazzo in the knee, spine, and face.[3] Creazzo lost control of her car, which swerved across the median and stopped on the front lawn of the Thornton Police Department. Harlan parked his car and approached Creazzo and Maloney. Harlan pulled Maloney and her belongings from the car, warning Creazzo not to tell anyone what had happened and threatening to kill her if she did. Harlan then dragged Maloney to his car and drove away.

On February 15, 1994, police arrested Harlan in connection with Creazzo's shooting and Maloney's abduction. Maloney's body was found on February 19, 1994; an autopsy revealed that she suffered several skull and facial fractures, wounds consistent with sexual assault, and other severe injuries. The autopsy also established that Maloney died from a gunshot wound to the head. Harlan eventually was charged with one count of first degree murder after deliberation, in violation of section 18–3–102(1)(a), 6 C.R.S. (1999); one count of felony murder, in violation of section 18–3–102(1)(b), 6 C.R.S.

---

1. We cite the most current version of the applicable statutes, referring in footnotes to the codification of the statute at the time of the defendant's trial if it is different than the current codification.

2. There is no other testimony as to events occurring between the time Maloney arrived at the Golden bus station parking lot and the time Creazzo encountered Maloney.

3. Creazzo is permanently paralyzed as a result of these injuries.

(1999); two counts of attempted first degree murder after deliberation, in violation of section 18–2–101(1), 6 C.R.S. (1999) and section 18–3–102(1)(a); two counts of second degree kidnapping, in violation of section 18–3–302, 6 C.R.S. (1999); and one count of assault, in violation of section 18–3–202, 6 C.R.S. (1999). The prosecution also alleged that Harlan was eligible for mandatory sentencing for violent crimes pursuant to section 16–11–309, 8A C.R.S. (1986 & 1994 Supp.).

On June 20, 1995, a jury found Harlan guilty of all charges. The jury also determined that the defendant had used a deadly weapon during the attempted murders and that he had robbed and sexually assaulted Maloney in the course of kidnapping her. After hearing evidence in the sentencing phase of the trial, the jury returned a death sentence, which was subsequently imposed by the trial court.

Harlan appealed his convictions to the court of appeals and his death sentence to this court. We consolidated the appeal by transferring the court of appeals case to this court. After considering all the issues Harlan presents concerning both his convictions and sentence, we find no error that merits reversal of the death sentence. Moreover, independently reviewing the propriety of the death sentence under section 16–11–103(6), we find no factors that warrant overturning it. Accordingly, we dissolve the stay of execution and remand this case to the trial court to set a date for imposition of the sentence.

Harlan raises numerous pretrial, guilt phase, and sentencing phase claims of error. We find little guidance from the submitted defense briefs as to which of these claims have priority or are most significant from counsel's standpoint. *See People v. Rodriguez*, 914 P.2d 230, 303 (Colo.1996). Thus, we have selected those claims of error that we believe focus on the fundamental merits of the defendant's case. We address in this opinion those issues that: (1) come close to requiring reversal of the death sentence; (2) constitute legal questions that had not been discussed by us at the time this case was tried; or (3) potentially bear on future capital cases. Because they are clearly resolvable under our precedent, and because to discuss

each of the issues in depth would unnecessarily lengthen the opinion, we deny the balance of the defendant's claims without extensive discussion in the attached appendix, along with a brief statement of the legal principles or factual grounds that lead to a denial of the claim. We do not intend for the appendix to be cited and relied upon as authority; our brief statements in it are not sufficiently detailed to give guidance in future cases. However, they do constitute the law of this case for future reference.

In Part II we discuss the significant pretrial issues Harlan presents. Parts III and IV address the most important guilt and sentencing phase issues. Part V sets forth our statutorily mandated independent review of the defendant's death sentence.

## II. PRETRIAL ISSUES

### A. Voir Dire

#### 1.

▉▉▉ The Due Process Clauses of the United States and Colorado constitutions guarantee every criminal defendant the right to a fair trial. *See* U.S. Const. amends. V, XIV; Colo. Const. art. II, §§ 16, 25. Even minimal standards of due process are violated when an accused does not receive a fair trial. *See Groppi v. Wisconsin*, 400 U.S. 505, 509, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971); *see also In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). An impartial jury is a fundamental part of the constitutional right to a fair trial. *See People v. Rhodus*, 870 P.2d 470, 473 (Colo.1994); *People ex rel. Faulk v. District Court (Anderson)*, 673 P.2d 998, 1000 (Colo.1983). Every individual, whether detested or revered, is entitled to a fair trial before an impartial jury. *See Oaks v. People*, 150 Colo. 64, 68–69, 371 P.2d 443, 447 (1962).

#### a.

We have previously held that affording a criminal defendant full use of his allotted peremptory challenges is an intrinsic part of securing a balanced and impartial jury. In *People v. Macrander*, 828 P.2d 234, 246 (Colo.1992), we reversed the defendant's conviction because the trial court erroneously

denied his challenge for cause to a potential juror struck by the defendant's use of a peremptory challenge.[4] *Macrander* turned on our consideration of the role played by peremptory challenges in a criminal trial, particularly when exercised by an accused. We observed that "[t]he peremptory challenge serves the purpose of providing both the defense and the prosecution with a greater opportunity to secure a balanced and impartial jury by rejecting a limited number of prospective jurors without cause." *Id.* at 242 (internal quotation marks, citation and footnotes omitted); *see also People v. Prator*, 856 P.2d 837, 840 (Colo.1993) ("Peremptory challenges serve to 'eliminate extremes of partiality on both sides' and 'to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise.'") (quoting *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)).[5] We further recognized that "the opportunity to exercise the challenge has been described as 'one of the most important rights secured to an accused,' the erroneous deprivation of which 'must be condemned.'" *Macrander*, 828 P.2d at 243 (quoting *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894)).

In *Macrander*, 828 P.2d at 243, we explicitly considered whether a defendant, to warrant reversal of his conviction, must demonstrate that the trial court's improper denial of a challenge for cause resulted in a biased jury even though the challenged juror was removed by peremptory challenge. We held that no such prejudice need be proven, because the injury to the defendant is an impairment of his "ability to change the ultimate composition of the jury selected to try the case." *Id.* at 244; *see also Prator*, 856 P.2d at 842 ("[T]he more significant and controlling [rationale behind] our decision [in *Macrander*] is our recognition of the adverse effect of a trial court's erroneous ruling on a challenge for cause upon a defendant's 'opportunity to secure a balanced and impartial jury' ....") (citation omitted). Whether

granting the challenge for cause and whether, consequently, a different use of the defendant's peremptory challenge might have resulted in a different verdict is not relevant to determining if reversal is required. Denying the defendant full use of his statutorily guaranteed peremptory challenges is sufficient to overturn the defendant's conviction:

> We hold, therefore, that a trial court's erroneous ruling on a challenge for cause, which is followed by the defendant's use of a peremptory challenge to remove the suspect juror and the defendant's exhaustion of all available peremptory challenges, affects a substantial right of the defendant and cannot be deemed harmless error.

*Macrander*, 828 P.2d at 244 (footnote omitted); *see also Carrillo v. People*, 974 P.2d 478, 486–87 (Colo.1999).

b.

Although challenges for cause are specifically provided for by rule and by statute, *see* Crim. P. 24(b); § 16–10–103, 6 C.R.S. (1999), they stem from a defendant's constitutional rights to due process and to a trial before a fair and impartial jury. *See Rhodus*, 870 P.2d at 473. The right to challenge a potential juror for cause is an essential component of a fair trial. *See Carrillo*, 974 P.2d at 486; *Rhodus*, 870 P.2d at 473. A trial court must grant a challenge for cause if a prospective juror is unwilling or unable to accept the basic principles of criminal law and to render a fair and impartial verdict based upon the evidence admitted at trial and the court's instructions. *See People v. Russo*, 713 P.2d 356, 360–61 (Colo.1986). To this end, section 16–10–103 requires a trial court to sustain a challenge for cause if a prospective juror's state of mind evinces "enmity or bias toward the defendant or the state." *See also Carrillo*, 974 P.2d at 486; *People v. Davis*, 794 P.2d 159, 205–06 (Colo. 1990). Hence, we have held that "[i]f the trial court has *genuine doubt* about the juror's ability to be impartial under such circumstances, it should resolve the doubt by sustaining the challenge." *Russo*, 713 P.2d

---

**4.** The defendant exhausted his allotted peremptory challenges. *See Macrander*, 828 P.2d at 237.

**5.** In *Prator*, 856 P.2d at 840–42, we reversed the defendant's conviction on essentially identical grounds as those relied upon in *Macrander*.

at 362 (emphasis added); *see also Morgan v. People,* 624 P.2d 1331, 1332 (Colo.1981) ("A prospective juror should be excused if 'it appears doubtful' that he will be governed by the instructions of the court as to the law of the case.") (quoting *Jones v. People,* 23 Colo. 276, 279, 47 P. 275, 276 (1896)); *see also People v. Gurule,* 628 P.2d 99, 102–03 (Colo. 1981).

■ With respect to capital cases, these principles require a trial court to excuse a prospective juror for cause if the juror's views on the death penalty would prevent or substantially impair the performance of her duties in accordance with her instructions and her oath. *See Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Rodriguez,* 914 P.2d at 264. This standard applies to both the "death qualification" and "life qualification" of a potential juror; that is, the inquiry into whether the juror is unalterably opposed to, or in favor of, imposing the death sentence. *See Morgan v. Illinois,* 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Therefore, a capital defendant is entitled to a voir dire sufficient to ascertain whether prospective jurors can fairly consider both life imprisonment and a death sentence as possible punishments. *See id.* at 735–36, 112 S.Ct. 2222.

■ In both capital and noncapital cases, the trial court is afforded broad discretion in determining whether to excuse a juror for actual bias. *See Davis,* 794 P.2d at 204. A reviewing court will overturn a trial court's decision only upon a showing that the trial court abused its discretion. *See Carrillo,* 974 P.2d at 485. The justification for this normally highly deferential standard of review is that the resolution of a challenge for cause ultimately turns upon an assessment of a prospective juror's credibility, demeanor, and sincerity in explaining his state of mind. *See id.* at 485–86; *Russo,* 713 P.2d at 362. Because the trial court is in a superior position to evaluate these factors, reviewing courts are properly reluctant to disturb a trial court's determination based solely on review of a cold record. *See Davis,* 794 P.2d at 206. This deference extends to the trial court's resolution of statements by potential jurors that " 'may appear inconsistent or self-con-

tradictory.' " *Carrillo,* 974 P.2d at 487 (quoting *People v. Sandoval,* 733 P.2d 319, 321 (Colo.1987)).

■ However, our deference to the trial court's resolution of such statements is limited by the due process considerations set forth in *Morgan.* A capital defendant's right to due process is violated if the jury is empanelled without the trial court first making an adequate determination that none of its members will automatically vote for a death sentence upon the defendant's conviction for a death-eligible offense. *See Morgan,* 504 U.S at 728–29, 112 S.Ct. 2222. A reviewing court need not conclude that any such jurors actually were empanelled; reversal is required if there is a sufficient possibility that the trial court failed to identify and remove prospective jurors whose death penalty views render them unqualified under *Witt. See id.* at 736, 112 S.Ct. 2222 ("The risk that such jurors may have been empanelled ... and infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.") (internal quotation marks and citations omitted).

We recognize that there may be a tension between our obligation to review the record to ensure that the jury empanelled in a capital case satisfies due process requirements, *see id.* at 735–36, 112 S.Ct. 2222, and the principle of deference normally controlling our review of a trial court's rulings on a defendant's challenges for cause. *Morgan* requires us to carefully determine whether the record sufficiently establishes that no juror would automatically vote to impose a death sentence upon the defendant's conviction for a death-eligible offense.

■ Several important practical considerations justify our deference to the trial court's decisions concerning challenges for cause. *See Carrillo,* 974 P.2d at 486; *Russo,* 713 P.2d at 362. We do not, therefore, suggest departure from this principle of deference altogether, even in capital cases, where our review of the propriety of the conviction and sentence is uniquely extensive. *See Turner v. Murray,* 476 U.S. 28, 33, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *People v. Dunlap,* 975 P.2d 723, 765 (Colo.1999) (this court

is an "independent arbiter[ ]" of the propriety of a death sentence), *cert. denied,* —— U.S. ——, 120 S.Ct. 221, 145 L.Ed.2d 186 (1999). However, the nature of our deference changes in capital cases. In a noncapital case, we will overturn the trial court's resolution of a challenge for cause only if the record presents no basis for supporting it. *See Gurule,* 628 P.2d at 102–03 (stating that the defendant's conviction must be reversed because the challenged juror's voir dire "responses provided no such basis" for the trial court's resolution of the challenge for cause). In capital cases, however, especially when the challenged juror's voir dire statements are ambiguous or contradictory, we will affirm the trial court's disposition of a defendant's challenge for cause only if we find affirmative support in the record for it. The extent to which the record must support the trial court's ruling cannot be delineated in the abstract; it must be the result of our considered judgment when presented with the unique circumstances of the voir dire before us.

■■ The factual circumstances of *Morgan* required the Court to consider only the effect of the potential bias of jurors who actually sat on the defendant's jury. *See Morgan,* 504 U.S. at 722–24, 112 S.Ct. 2222. However, given the role under Colorado law of peremptory challenges in securing a fair and impartial jury, *see Macrander,* 828 P.2d at 242, we understand *Macrander* to require application of the *Morgan* standard of affirmative support in the record to the trial court's denial of a challenge for cause of a juror who is struck by the defendant's use of a peremptory challenge. Improper denial of a challenge for cause infringes the defendant's substantial right to full use of his peremptory challenges, thereby impermissibly restricting his ability to affect the ultimate composition of the jury sitting in judgment of him. *See id.* at 244. Regardless of whether the challenged jurors actually served on the jury or were removed by peremptory challenge, our task is to ensure that there are affirmative reasons discernible in the record to conclude that the trial court's rulings on the defendant's challenges for cause resulted in a jury that could fairly consider evidence in aggravation and mitiga-

tion before imposing a sentence on the defendant.

#### c.

■■■ Trial courts also enjoy broad discretion in fashioning the process by which voir dire is conducted. *See Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *People v. Collins,* 730 P.2d 293, 300 (Colo.1986). A trial court's decisions concerning the scope of voir dire and the propriety of questions put to the jury will not be disturbed absent an abuse of discretion. *See Collins,* 730 P.2d at 300. In considering whether a trial court properly oversaw voir dire, this court has kept in mind that a key function of voir dire is to " 'enable counsel to determine whether any prospective jurors are possessed of beliefs which would cause them to be biased in such a manner as to prevent the [defendant] from obtaining a fair and impartial trial.' " *Rodriguez,* 914 P.2d at 260 (quoting *Collins,* 730 P.2d at 300); *see also People v. O'Neill,* 803 P.2d 164, 169 (Colo.1990).

■■■ As such, an adequate voir dire is an essential part of the defendant's right to a fair trial. *See Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). A searching voir dire also is necessary for the trial court to fulfill its responsibility to remove prospective jurors who cannot impartially weigh the evidence and follow the court's instructions. *See Morgan,* 504 U.S. at 729, 112 S.Ct. 2222. While appellate courts normally defer to trial-level resolution of voir dire issues, capital cases inherently require a more searching degree of review. *See id.* at 730, 112 S.Ct. 2222; *Turner,* 476 U.S. at 33, 106 S.Ct. 1683.

With these principles in mind, we now turn to the prospective jurors challenged for cause by the defendant in this case.

#### 2.

Harlan asserts that the trial court erroneously denied his sentencing phase challenges for cause to twelve jurors. One challenged juror eventually served on the jury, while Harlan exercised peremptory challenges to remove the remaining eleven jurors. We

state at the outset that the sentencing phase voir dire in this case hardly serves as a model for selecting a fair and impartial capital jury. The means by which the jury was selected comes precipitously close to requiring reversal of the defendant's sentence. *See Morgan*, 504 U.S. at 739 & n. 11, 112 S.Ct. 2222; *Turner*, 476 U.S. at 37, 106 S.Ct. 1683; *Witherspoon*, 391 U.S. at 523 n. 21, 88 S.Ct. 1770. However, applying the very careful standard of review controlling our analysis of death penalty cases, *see Morgan*, 504 U.S. at 730, 112 S.Ct. 2222; *Turner*, 476 U.S. at 33, 106 S.Ct. 1683, we do not conclude that the trial court abused its discretion in ruling on Harlan's challenges for cause. Therefore, we hold that Harlan suffered an infringement of neither his substantial right to full use of his peremptory challenges nor his due process right to a fair and impartial jury.

### a.

■ We begin with a discussion of the voir dire method employed in this case. In addition to being questioned in groups regarding many issues, prospective jurors were examined individually regarding their views on the death penalty.[6] In these individual voir dire sessions, the prosecution and defense counsel were allowed to question each juror, with counsel alternating as to who went first. Each counsel was allowed only one opportunity to question each juror. Once this opportunity was exhausted, neither counsel was allowed to rehabilitate or reexamine a juror after opposing counsel's inquiry. The trial court only rarely asked questions of the jurors. At different times during this process, both counsel objected to the format and requested an opportunity to reexamine a juror in order to better understand the juror's views. The trial court, with one exception, refused these requests.[7]

Both counsel attempted to discern whether each juror's views on the death penalty would substantially impair the juror's ability to be impartial. However, counsels' questions regularly produced contradictory responses from the jurors regarding whether they would always vote to impose death upon conviction for first degree murder. The contradictory responses were almost never reconciled by additional statements from the jurors. Defense counsel repeatedly inquired into whether a juror would invariably impose death upon conviction, while the prosecutor asked whether the juror could be fair and follow the law as explained by the court. Time after time, jurors expressed a belief that they could follow the law while also indicating that they held the contradictory position that they would automatically impose a death sentence upon conviction.

This situation is particularly problematic given that the Supreme Court has indicated that "general fairness and 'follow the law' questions" are not always sufficient to detect those jurors with views preventing or substantially impairing the performance of their duties in accordance with their instructions and oath. *See Morgan*, 504 U.S. at 734, 112 S.Ct. 2222. In response to general questions of fairness and impartiality, "such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed." *Id.* at 735, 112 S.Ct. 2222. However, "such jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding." *Id.* As the case before us demonstrates, "certain prospective jurors maintain such inconsistent beliefs—that they can follow the law, but that they will always vote to impose death for conviction of a capital offense." *Id.* at 735 n. 9, 112 S.Ct. 2222.[8]

6. Jurors also were questioned individually concerning their exposure to pretrial publicity. *See infra* Part II.B.

7. The trial court allowed counsel to question further Juror Tsai concerning his death penalty views after Tsai, during panel voir dire, spontaneously expressed continuing reservations about his ability to follow the sentencing process.

8. The prosecution's questions in this case, particularly when posed in leading form, concerning the ability of prospective jurors to follow the four-step sentencing process could be viewed as disguising the extent to which jurors may have been inclined to automatically impose the death penalty. As phrased, the questions did not make clear to jurors that the four-step process was the

Furthermore, affirmative responses to general fairness and "follow the law" questions are even less reliable indicators of impartiality when they are combined, as was the case here, with jurors' statements that they would always vote to impose death upon conviction and the lack of further questioning to resolve the apparent inconsistencies. While neither the United States constitution nor the Colorado constitution "dictate[s] a catechism for voir dire," *id.* at 729, 112 S.Ct. 2222, we express our general disapproval of the sentencing voir dire method and questions employed here because they may, in other cases, create too great a risk that the jury empanelled will not be impartial.[9]

### b.

Nevertheless, in view of the deference we afford trial courts concerning voir dire examination, we conclude that the trial court did not abuse its discretion in how it conducted the voir dire. The record before us adequately supports the trial court's resolution of the challenges for cause. In reaching this conclusion, we have kept in mind the qualitative uniqueness of the death penalty and the correspondingly greater degree of scrutiny required of us. *See Mills v. Maryland,* 486 U.S. 367, 376–77, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (citing cases); *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Dunlap,* 975 P.2d at 735; *People v. Young,* 814 P.2d 834, 843 (Colo.1991). Despite the limitations and defects of the voir dire we discuss above, our exacting review of the record discloses support for the trial court's rulings.[10]

The trial court gave no affirmative indication that it was unable to fulfill its responsibility to remove prospective jurors who cannot impartially weigh the evidence and follow the court's instructions.[11] *See Rosales–Lopez,* 451 U.S. at 188, 101 S.Ct. 1629. The principle of deference applicable to our review requires us to presume that the trial court's decisions were based on nonverbal communications from jurors that do not appear in the transcript. *See Carrillo,* 974 P.2d at 486. Moreover, we can detect nothing in the record suggesting that the trial court's decision-making was impermissibly impaired. *See Russo,* 713 P.2d at 362 ("In the absence of an affirmative showing that the trial court has *clearly* abused its discretion in passing on the challenge for cause, its decision will not be disturbed on appeal.") (emphasis added). We therefore view the trial court's denial of the challenges for cause as sufficient evidence that the court did not possess genuine doubt as to the fitness of the jurors, despite their equivocating or contradictory statements. *See id.* While we think the better practice would have been for the trial court to allow further questioning by counsel, or to ask its own questions, to resolve the jurors' contradictory or equivocating statements, the absence of such additional examination does not, by itself, demonstrate that the trial court abused its discretion in ruling on the challenges for cause. *See Carrillo,* 974 P.2d at 488.

Moreover, while both sides expressed the desire to rehabilitate or reexamine jurors, neither the prosecution nor, more importantly, defense trial counsel ever indicated a be-

---

means by which they would be required to determine if a death sentence were appropriate.

9. Currently, sentencing in capital cases is done by a three-judge panel. *See* § 16–11–103(1)(a), 6 C.R.S. (1999).

10. We do not mean to suggest that any of these factors are independently dispositive of the question before us, or that these factors, if present in other cases, would mandate the same result as the one reached here. Our holding that the trial court in this case did not abuse its discretion in denying the challenges for cause flows from the specific factual circumstances presented to us. Our examination of the peculiarly problematic sentencing voir dire reveals factors supporting

the exercise of discretion of the trial court in this instance.

11. The court's remark that it was "not sure how [Juror Gallatin] came down on the death penalty," could be read to indicate that the court was unable to determine whether that juror could be impartial despite her personal views on the death penalty. However, we consider the remark in the context of the court's subsequent comment that it was uncertain whether the juror understood "what was going on" with what we understand as a reference to the defense attorney's questions. Thus, we believe that the court merely expressed its belief that the juror did not understand some of the questions asked by the defense attorney.

lief that the voir dire as conducted hindered them from determining whether prospective jurors were qualified to render a sentencing decision in a capital case. *See Rodriguez*, 914 P.2d at 260. Harlan's counsel did complain of the trial court's unwillingness to allow rehabilitation or reexamination of jurors, but did not suggest that this refusal inhibited their ability to determine whether prospective jurors were qualified.

We do not suggest that defense counsel's apparent satisfaction with the sentencing voir dire process as a whole compels our conclusion that the trial court correctly ruled on the defendant's challenges for cause. Rather, this apparent belief provides indirect and partial support for the proposition that the trial court gained sufficient information through the voir dire process to enable it to dispose of Harlan's challenges for cause in a manner consistent with proper exercise of its broad discretion. *See Rosales–Lopez*, 451 U.S. at 188–89, 101 S.Ct. 1629; *Davis*, 794 P.2d at 206.

The record adequately supports the trial court's disposition of the challenges for cause. While we are deeply troubled by the number of times the trial court failed to resolve contradictory or equivocal statements by jurors prior to ruling on the challenges, this failure is not decisive in the defendant's favor. *See Davis*, 794 P.2d at 204–05. The trial court explicitly stated its grounds for denying nine of Harlan's twelve sentencing phase challenges for cause. There is a sufficient basis in the record for the trial court to have found each challenged juror qualified to serve, "regardless of whether we might have reached a different conclusion," as to the fitness of any of the jurors. *Carrillo*, 974 P.2d at 487.

We do not discuss each of the jurors in detail because to do so would unnecessarily lengthen this opinion. The examples set forth below are representative of the grounds upon which the trial court could properly have based its decision in regard to each juror Harlan challenged for cause.

### (1) Juror Salter

■ Juror Salter served on the jury in this case. While she indicated her personal belief in a "blanket policy" favoring the death penalty for all persons convicted of first degree murder, she also expressed a willingness to consider various types of mitigating evidence and to follow the four-step sentencing process:

[DEFENSE:] Well, the person commits the first-degree murder after deliberation, intentionally but there might be things in the background like his family who loved him, used drugs, things like that. Are those the types of things that could change your opinion?

[JUROR SALTER:] It possibly could, depending on what is brought forward.

[DEFENSE:] Okay. What types of things do you think might affect you, having given you some examples?

[JUROR SALTER:] That could change my mind?

[DEFENSE:] Uh-huh.

[JUROR SALTER:] I guess kids hit me home pretty closely. If the individual was brought up in an abusive family where the mother or father were emotionally or physically abusive and just the way—because life can be pretty hard on some people and it can be pretty easy for others. It would just depend on what type of lifestyle that person had lived or had grown up in.

That would definitely probably make me change my mind because I've seen it corrupt, you know, with the type of job—I carry mail and I am out and about and around people all the time and I see a lot of abuse and I see the way it changes people.

[DEFENSE:] Okay. Can you tell me—and I know you're thinking through this as we go along and we appreciate the difficulty of that. Can you tell me how—what you've just said about, you know, the abuse or other factors may change your mind and make you feel like a life sentence is appropriate, how that weighs out with what you said earlier about it should be applied automatically in every case of that nature?

[JUROR SALTER:] Right. Okay. The first one was that if the prosecution goes ahead and they state everything and it's all

put out on the line then and, yes, this individual did do this, no doubt in my mind.

[DEFENSE:] Right.

[JUROR SALTER:] That's really hard. And say that the person was abused. I would have to put the evidence together and do my best judgment at that time. Each case is individually different so I couldn't really answer your question. That makes it rough, you know, because, like I said, the policy is what I do believe in. I can't answer that.

[DEFENSE:] Okay. Do you understand my dilemma?

[JUROR SALTER:] I do.

[DEFENSE:] Because it sounded like what you were saying at first with the blanket policy would mean that those individual factors are for people who committed first-degree deliberate murder, that you wouldn't want to consider those factors.

[JUROR SALTER:] It's confusing for you now, too?

[DEFENSE:] Yes, it is. You understand the dilemma?

[JUROR SALTER:] Uh-huh.

[DEFENSE:] Give us your best—you know, the blanket policy that you talked about—

[JUROR SALTER:] Right.

[DEFENSE:]—indicated that each person who is guilty of that type of first-degree murder should be executed regardless of, you know, those other things because that would make it inconsistent in its application.

[JUROR SALTER:] Uh-huh.

[DEFENSE:] So if somebody was abused, we don't execute them. Somebody who wasn't, we do execute them but maybe I'm misreading. I guess you just tell me, you know, your bottom line as to—

[JUROR SALTER:] Then I would just forget the abuse and the way the person was brought up and go back to the blanket policy, that way, because I feel the same about both. And so it's not confusing for you or anybody else, I'll just go with the blanket policy.

[DEFENSE:] That's where your strongest feelings are?

[JUROR SALTER:] Uh-huh.

[DEFENSE:] All right. And to change, to take you away from those feelings of that policy, would you expect us to prove to you that somehow you should come out of that policy in order to change it?

[JUROR SALTER:] Have mercy upon the person, yes.

After hearing the defendant's challenge for cause, the trial court made these observations:

Ms. Salter, like so many other people, is obviously not a perfect juror but the thing that impresses me about Ms. Salter is that she was one of the few people that we've talked to in here that came up with some of the factors that could be considered in mitigation. And without prompting from Mr. Grant or Ms. Brake she said that mitigation could change her mind, alcohol, how the child was brought up, mom and dad's mentally abusive lifestyle, past history.

It seems to me that her articulation of those factors indicates to the Court that she can and will and would consider mitigation in this case. She said certainly that she did agree with the death penalty. But I also get the impression from listening to what she was saying that she would follow the law and would not automatically impose the death penalty. I don't believe she is substantially impaired. I won't excuse Ms. Salter.

Given our obligation to ensure that no member of the defendant's jury would automatically vote for a death sentence upon his conviction for a death-eligible offense, *see Morgan*, 504 U.S. at 735–36, 112 S.Ct. 2222, our decision to uphold the trial court's denial of the defendant's challenge for cause against Salter is a difficult one. The equivocal nature of Salter's statements, however, does not allow us to "displace the trial court in its role as evaluator of credibility." *Davis*, 794 P.2d at 206; *see also Carrillo*, 974 P.2d at 485. The trial court concluded—and the record viewed as a whole provides affirmative support for its finding—that it did not have

genuine doubts that Salter could consider mitigating evidence and follow the sentencing process. *See Davis,* 794 P.2d at 205–06.

### (2) Juror Fry

■■■ Juror Fry was challenged for cause by the defendant based on his inability to sentence fairly. The trial court denied the challenge, and Harlan eventually exercised his eighth peremptory challenge to remove Fry. Fry's sentencing voir dire is reproduced below; it fairly represents the kind of contradictory and equivocal statements elicited by both counsel from many jurors.

> [PROSECUTOR:] Okay. And I believe in your questionnaire you wrote that you believe that that's—that you have no problem with it [the death penalty] as long as it's the law?
>
> [JUROR FRY:] That is correct.
>
> [PROSECUTOR:] And you heard today the four-step process that the law requires with respect to a death penalty sentencing hearing?
>
> [JUROR FRY:] Yes.
>
> [PROSECUTOR:] That's the law that the judge instructs you, is that a law you can follow?
>
> [JUROR FRY:] Yes.
>
> [PROSECUTOR:] And you understand that that doesn't mean that everybody that's convicted of intentional, deliberate first-degree murder, gets the death penalty?
>
> [JUROR FRY:] That is correct.
>
> [PROSECUTOR:] Do you believe that's the way it ought to be?
>
> [JUROR FRY:] If that's the way the jurors are feeling, yes.
>
> [PROSECUTOR:] Okay. So you agree with the law in Colorado that says you go through this four-step process. It's not automatic that everybody convicted of intentional, deliberate murder gets death?
>
> [JUROR FRY:] I believe that the way the laws are lined up, that is right.

Subsequently, defense counsel questioned Juror Fry:

> [DEFENSE:] Now, you had also indicated that—I think you told [the prosecutor] that

the death penalty shouldn't be given in all what we call first-degree murder offenses, which are intentionally, after deliberation, and without, you know, self-defense or accident or things of that nature, causes the death of another human being. Is that what you—do you agree with that or do you think the death penalty should be given in those circumstances?

> [JUROR FRY:] If it's right out just murder and killing somebody for no reason or anything, yes.
>
> [DEFENSE:] Okay. So you think the death penalty should be given?
>
> [JUROR FRY:] Yes.
>
> [DEFENSE:] Where it's just out-and-out murder?
>
> [JUROR FRY:] Yes.
>
> [DEFENSE:] And the prosecution has proven the case? Okay. So again when we're talking about murder is intentionally, he meant to do it; after deliberation, meaning he thought about it or planned it; without legal justification, meaning accident or not accident, not self-defense, not legal insanity, causes the death of another person, that's the kind of case that you think that the death penalty should be given?
>
> [JUROR FRY:] Yes.
>
> [DEFENSE:] And you think it should be given in every case which they've proved beyond a reasonable doubt, you know, to your satisfaction that it's intentionally, after deliberation, causes—without legal justification, causes the death of another person?
>
> [JUROR FRY:] I believe so, yes.
>
> [DEFENSE:] Okay. Are there any facts or factors that would convince you otherwise?
>
> [JUROR FRY:] It would depend upon the evidence that the prosecution presented.
>
> [DEFENSE:] Okay. So—
>
> [JUROR FRY:] Whether there was reasonable doubt that that was the person or not.
>
> [DEFENSE:] Okay. So other than whether there's reasonable doubts of the person out there, there are no other facts or circumstances that you would consider?

[JUROR FRY:] I don't believe so.

After hearing the defendant's challenge for cause, the trial court made these remarks concerning Fry's views on the death penalty:

I think Mr. Fry's going to be a good juror. I don't think he's substantially impaired from this case by view of his opinions on the death penalty.

. . . .

And I think Mr. Fry would listen to all of the circumstances in mitigation and aggravation and make a decision and I don't think we can ask for anything more than that. I will not excuse Mr. Fry.

The record is adequate to support the trial court's ruling. The trial court's decision to deny Harlan's sentencing phase challenge for cause was predicated principally on its finding that Juror Fry could consider both aggravating and mitigating circumstances. When asked directly by defense counsel whether he believed anyone found guilty of first degree murder should get a death sentence, Juror Fry indicated that he in fact thought so. However, defense counsel's questions did not establish that Fry could not set aside those personal beliefs and follow the law as instructed.

Moreover, when questioned by the prosecution, Fry indicated an adequate understanding of the sentencing process and a willingness to follow that process when determining what sentence to impose on the defendant. Juror Fry also told the prosecution that the death sentence may not be appropriate punishment for all instances of first degree murder. While there are troubling inconsistencies in Fry's various statements concerning the death penalty, we conclude that the record provides enough evidence to support the trial court's denial of Harlan's sentencing phase challenge for cause.

### 3.

This court is obligated to ensure that the defendant was tried by a jury able to consider fairly both the death penalty and alternative punishments, in light of the aggravating and mitigating evidence presented to it. See Morgan, 504 U.S. at 728–29, 112 S.Ct. 2222. If there is a "substantial possibility" that the

jury did not meet this due process requirement, the death penalty in this case must be reversed. Mills, 486 U.S. at 377, 108 S.Ct. 1860. Moreover, we must determine whether Harlan's substantial right to full use of his peremptory challenges was impermissibly infringed by the trial court's erroneous denials of his challenges for cause. See Macrander, 828 P.2d at 244. While we believe that the sentencing voir dire conducted here was inherently problematic, we nonetheless conclude that it was constitutionally sufficient in that the record provides adequate support for the trial court's rulings on the defendant's challenges for cause. Therefore, we deny the defendant's claim.

### B. Venue

Harlan contends the trial court erred in denying his change of venue motion. We hold that the defendant was not deprived of a fundamentally fair trial even though we, were we the in trial court's place, may have decided that a change of venue was merited. The basis for our holding is that the ·trial court acted within its discretion in denying the motion.

### 1.

■■■■ The decision to grant a change of venue rests in the sound discretion of the trial court. See § 16–6–101, 6 C.R.S. (1999); Crim. P. 21(a)(1) ("The place of trial may be changed when the court in its sound discretion determines that a fair or expeditious trial cannot take place in the county or district in which the trial is pending."). Of course, the trial court abuses its discretion if its rulings deny the defendant a fundamentally fair trial. The critical inquiry for this court is whether the trial court preserved the accused's right to a fair trial. See People v. Botham, 629 P.2d 589, 596 (Colo.1981).

In Botham, 629 P.2d at 597, we held that, to be entitled to a change of venue, a defendant must show either: (1) the existence of massive, pervasive, and prejudicial publicity that created a presumption that the defendant was denied a fair trial; or (2) the denial of a fair trial "based upon a nexus between extensive pretrial publicity and the jury pan-

el" that created actual prejudice against the defendant. Although pretrial publicity was extensive—Harlan documents approximately sixty-four newspaper articles plus other forms of publicity—we uphold the trial court's findings that the defendant did not establish a presumption of prejudice and that there was not actual prejudice sufficient to require a change of venue.

### 2.

#### a.

 Harlan asserts that the jurors' pervasive exposure to pretrial publicity created a presumption of partiality. We do not agree. The existence of extensive pretrial publicity does not alone trigger a due process entitlement to a change of venue. Rather, we will presume prejudice only in extreme circumstances. As this court observed in *People v. McCrary*, 190 Colo. 538, 545, 549 P.2d 1320, 1325–26 (1976):

> To hold that jurors can have no familiarity through the news media with the facts of the case is to establish an impossible standard in a'nation that nurtures freedom of the press. It is therefore sufficient if jurors can lay aside the information and opinions they have received through pretrial publicity. Only when the publicity is so ubiquitous and vituperative that most jurors in the community could not ignore its influence is a change of venue required before voir dire examination.

(Citations omitted.)

 To determine whether the defendant is entitled to a change of venue under this standard, in *McCrary* we set forth several factors to guide our analysis: the size and type of locale; the reputation of the victim; the revealed sources of the news stories; the specificity of the accounts of certain facts; the volume and intensity of the coverage; the extent of comment by the news reports on the facts of the case; the manner of presentation; the proximity to the time of trial; and the publication of highly incriminating facts not admissible at trial. *See id.*, 549 P.2d at 1326. Our consideration of these factors satisfies us that prejudice may not be presumed in this case and that the trial court acted within its discretion when it found Harlan did not make a showing of such prejudice. Therefore, the defendant's trial was not fundamentally unfair under the first prong of the *Botham* test.

Harlan's trial occurred in Adams County, one of the largest counties in Colorado. The reputation of the victim, Maloney, was barely discussed by the media. Although there was substantial media coverage of the crime created by the trial itself, most of the pretrial publicity occurred more than one year prior to the trial. Nothing in the record suggests that the "specificity of the accounts of certain facts," the "extent of comment by the news reports on the facts of the case," the "manner of presentation," or "publication of highly incriminating facts not admissible at trial" created publicity so "ubiquitous and vituperative that most jurors in the community could not ignore its influence." *Id.*, 549 P.2d at 1325–26. Similarly, the "manner of presentation" of the publicity is not sufficiently problematic to find error in the trial court's rulings. *Id.*, 549 P.2d at 1326.

We recognize that there was an impressive amount of publicity created by the defendant's offenses, their investigation, and the trial itself. However, the majority of the publicity occurred long before the trial. As the trial court stated, "It appears ... from the voir dire we've been conducting that not many of the jurors had a lot of recent information regarding this particular case." Our independent review of the record supports the trial court's claim. A significant passage of time between the occurrence of publicity and the trial decreases the prejudicial effect of pretrial publicity. *See Patton v. Yount*, 467 U.S. 1025, 1032, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *McCrary*, 190 Colo. at 545, 549 P.2d at 1326. We conclude that the trial court's findings are supported by the evidence. We recognize that there were sound reasons supporting a change of venue, particularly in light of the extreme heinousness of the offenses that the defendant was accused of committing; however, we hold that the trial court acted within its discretion in denying the motion for change of venue based on the allegation of presumed prejudice.

b.

■ Harlan also has not shown that pretrial publicity created actual prejudice against him in the jury panel. *See Botham,* 629 P.2d at 597. The trial court allowed counsel to conduct extensive individualized voir dire concerning the jurors' exposure to publicity. We conclude that this and related measures undertaken by the trial court sufficiently protected Harlan's right to a trial before an impartial jury. *See id.* at 596 (holding that the trial court may take means short of venue change to protect defendant's right to a fair trial). The trial court found that a majority of the prospective jurors did not remember highly inflammatory information despite their exposure to newspaper and television reports. Many of the prospective jurors were also critical of the news media and expressed a willingness to set aside what they had learned. The trial court, moreover, excused twenty prospective jurors who recalled inflammatory information or were unwilling to set aside what they had learned from media reports.

In seating jurors on the basis of their responses, the court was satisfied that those who had been exposed to pretrial publicity could "set aside the information that they have received and try the case only upon the facts in evidence that are going to be presented at trial." The voir dire record supports these findings. The jury in this case satisfied the constitutional requirement of impartiality. Therefore, we find no abuse of discretion in the trial court's denial of Harlan's request for a change of venue.

### III. GUILT PHASE ISSUES

#### A. Instruction on Affirmative Defense of Intoxication

Harlan argues that the trial court erroneously instructed the jury to consider whether, due to his voluntary intoxication, he had the capacity to form the specific intent required for first degree murder. The defen-

dant alleges that this instruction violated his due process right to require the prosecution to prove him guilty beyond a reasonable doubt of all the elements of the charged offense, by impermissibly lowering the prosecution's burden of proof concerning his affirmative defense of intoxication. We hold that the instruction given, based on model instruction COLJI–Crim. 7:13 (1983), is an incorrect statement of law, but that it constituted harmless error in this case.

1.

■ We begin by explaining why voluntary intoxication, evidence of which is introduced to negate the specific intent element of the charged offense, does not constitute an affirmative defense under section 18–1–804, 6 C.R.S (1999). At trial Harlan asserted a right to have his voluntary intoxication defense presented to the jury as an affirmative defense. The prosecution did not object, and Trial Phase Instruction No. 28—following the model instruction—instructed the jury that the defendant's claim of voluntary intoxication was an affirmative defense. On appeal, neither party challenges the characterization. We address this issue *sua sponte* to avoid perpetuating the confusion presented in this case.

According to section 18–1–804(1):

Intoxication of the accused is not a defense to a criminal charge, except as provided in subsection (3) of this section, but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant when it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged.[12]

Subsection (1) indicates that intoxication is not a defense, but that evidence of intoxication is relevant to whether the defendant had the specific intent required by the charged offense.[13] That is, the statute sets

---

**12.** Under section 18–1–804(3), 6 C.R.S. (1999), "[a] person is not criminally responsible for his conduct if, by reason of intoxication that is not self-induced at the time he acts, he lacks capacity to conform his conduct to the requirements of the law."

**13.** The statute's plain language shows a clear legislative intent not to categorize section 18–1–804(1) as an affirmative defense, whereas subsection (3) is such a defense. The legislature's intent must guide our construction of the statute. *See People v. Baer,* 973 P.2d 1225, 1228 (Colo.

forth a rule concerning the admissibility of evidence of intoxication by the defendant to counter the prosecution's evidence that the defendant had the requisite specific intent of the charged offense. Such evidence does not excuse or justify the criminal conduct, absolving the defendant of criminal liability, as do affirmative defenses. *See, e.g.,* §§ 18–1–701 to –710, 6 C.R.S. (1999). Section 18–1–804(1) absolves a defendant of liability only for a specific intent offense when the evidence of intoxication negates the existence of the specific intent. A defendant, after introducing such evidence, nonetheless remains liable for a lesser included general intent offense (in this case, second degree murder).

Therefore, subsections (1) and (3) are distinct in language, function, and effect. Subsection (1) is explicitly described as not comprising a defense, whereas subsection (3) is denominated as a defense. *See* § 18–1–804(1). The function of subsection (1) is to identify evidence of voluntary intoxication as relevant to the issue of whether a defendant had the mental state required for a specific intent offense. Subsection (3) asks whether the defendant had the capacity to conform his conduct to the requirements of the law in light of intoxication that was not self-induced. Subsection (1) weighs in on the issue of specific intent, whereas subsection (3) excuses a defendant of all criminal liability. We previously have recognized these differences between subsections (1) and (3). *See People v. Low,* 732 P.2d 622, 627–28 (Colo.1987).

We therefore understand the plain meaning of subsection (1) to be that it is an evidentiary rule permitting the introduction of evidence of voluntary intoxication to negate the requisite specific intent of the charged offense.

### 2.

■ Harlan was not entitled under section 18–1–804 to an instruction setting forth an affirmative defense of intoxication. He would have been entitled to such an instruction only if he introduced evidence suggest-

ing he was unable to conform his conduct to the requirements of the law due to intoxication that was not self-induced. *See* § 18–1–804(3)–(4). The defendant did not satisfy these conditions. Harlan presented no evidence that his intoxication was involuntary. He did not argue that he was unable to conform his conduct to the requirements of the law. His claim instead was that he was voluntarily intoxicated and that he did not intend to kill his victim or deliberate prior to the killing. Therefore, the defendant's claim falls squarely under section 18–1–804(1).

■ Nevertheless, we must determine whether Trial Phase Instruction No. 28 violated the defendant's due process right to require the prosecution to prove his guilt beyond a reasonable doubt as to every element of first degree murder. Harlan asserts that Trial Phase Instruction No. 28 impermissibly lowered the prosecution's burden of proof because it required the jury to consider only whether, in light of the evidence of intoxication presented by the defendant, the prosecution proved that the defendant had the *capacity to form* the requisite specific intent element of first degree murder, not whether he *in fact formed* the specific intent. We hold that the trial court committed harmless error by so instructing the jury.

### a.

■■ It is an essential feature of a fair trial that the trial court correctly instruct the jury on all matters of law. *See People v. Mattas,* 645 P.2d 254, 257 (Colo.1982). A defendant's right to due process requires correct jury instructions when such instructions bear on the prosecution's burden to prove the defendant guilty beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Hendershott v. People,* 653 P.2d 385, 390 (Colo.1982); *Mattas,* 645 P.2d at 257.

Trial Phase Instruction No. 28 stated that:

It as an affirmative defense to the crimes of First Degree Murder after deliberation,

---

1999). This language also distinguishes section 18–1–804(1) from other statutes in which an affirmative defense is predicated on negating a culpable mental state. *See* §§ 16–8–101.3 to –

103.5, 6 C.R.S. (1999) (affirmative defense of not guilty by reason of insanity); 18–1–504(1)(a), 6 C.R.S. (1999) (affirmative defense of ignorance or mistake).

First Degree Assault and Attempted First Degree Murder after deliberation that the defendant, because of intoxication, *did not have the capacity to form that specific intent* required by the offense.

(Emphasis added.)

We hold that the trial court erred in giving Trial Phase Instruction No. 28 because the instruction mistakenly conflates subsections (1) and (3) of section 18–1–804. The instruction fuses the "specific intent" element of subsection (1) with a single term from the "capacity to conform his conduct" element of subsection (3). The defendant's claim of intoxication falls under section 18–1–804(1), which, as we have seen, states that evidence of intoxication is admissible when it bears on the question of whether the defendant *in fact* had the specific intent of the charged offense. Trial Phase Instruction No. 28, however, called for the jury to consider whether intoxication eliminated Harlan's *capacity* to form the specific intent. Proving that Harlan had the capacity to form the requisite specific intent does not also prove that he in fact formed it. Therefore, the instruction misstates how the jury was to consider the evidence of intoxication. Although Trial Phase Instruction No. 28 is an erroneous statement of law, it does not require reversal of the defendant's conviction or sentence.

b.

Harlan asserts that Trial Phase Instruction No. 28 is in direct conflict with the trial court's instructions concerning the elements of first degree murder, which correctly stated that the defendant is guilty of first degree murder only if he had the requisite specific intent, and not merely the capacity to form that intent. The result of this conflict, he further claims, is that the prosecution's burden of proof concerning the first degree murder charge was impermissibly lowered. Because Harlan preserved the issue for appeal, we consider his claim under a harmless error standard. Under this standard, "trial errors require reversal unless the appellate court can declare a belief that the error was harmless beyond a reasonable doubt." *Dunlap*, 975 P.2d at 737 (internal quotation marks omitted). Our inquiry is whether Tri-

al Phase Instruction No. 28, in light of the other instructions given and presented in the guilt phase, contributed to the verdicts ultimately rendered or undermined the fundamental fairness of the trial. *See id.; Bogdanov v. People*, 941 P.2d 247, 253 (Colo.1997).

We conclude that the use of Trial Phase Instruction No. 28 was harmless beyond a reasonable doubt. The jury instructions taken as a whole kept the prosecution to its proper burden of proof concerning all the elements of first degree murder. See *People v. Riley*, 708 P.2d 1359, 1365 (Colo.1985) (stating that "in determining the propriety of a particular jury instruction the instructions should be viewed as a whole"); *People v. Travis*, 192 Colo. 169, 171, 558 P.2d 579, 581 (1976) ("It is axiomatic ... that instructions are to be read as a whole and that if taken as a whole they adequately inform the jury of the law, there is no reversible error."). Trial Phase Instruction No. 28, read alone, tends to create the erroneous impression that, to rebut what is mistakenly called the defendant's affirmative defense, the prosecution need only prove that Harlan had the capacity to form the specific intent required for first degree murder. However, the trial court also correctly instructed the jury that, to carry its burden of proof concerning the first degree murder charges, the prosecution must prove beyond a reasonable doubt each element of the offense, including the specific intent element. *See* Trial Phase Instruction No. 6. The jury therefore always had before it an instruction that correctly stated both the culpable mental state element of first degree murder and the prosecution's burden of proof concerning the offense, as well as the affirmative defense instruction which required the prosecution to prove beyond a reasonable doubt Harlan's capacity to form the mental state. In effect, then, the instructions functioned consistently: proving that the defendant in fact formed the specific intent for first degree murder implies proof that he had the capacity to form the intent. The affirmative defense instruction highlighted one aspect of the prosecution's burden of proof, but did not thereby lower that burden. The instructions given in this case, viewed as a whole, held the prosecution to its proper burden. Therefore, Harlan was not de-

prived of his right to a trial by jury. See *Travis*, 192 Colo. at 171, 558 P.2d at 581. The jury, in order to conclude that Harlan was guilty of first degree murder, was required to find that the prosecution proved that the defendant had the capacity to form, and in fact did form, the requisite specific intent. See *Hendershott*, 653 P.2d at 390; *Mattas*, 645 P.2d at 259.

This case is thereby distinguishable from those in which reviewing courts have found reversible error due to jury instructions that improperly lowered the prosecution's burden of proof concerning the offense *See, e.g., Sullivan v. Louisiana*, 508 U.S. 275, 281–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous definition of reasonable doubt); *People v. Vance*, 933 P.2d 576, 580–81 (Colo.1997) (failure to submit an element of the offense to jury). Absent evidence to the contrary, we presume that a jury follows the trial court's instructions. *See Dunlap*, 975 P.2d at 743. The defendant presents no evidence to suggest that the jury failed to follow the guilt phase instructions that identified the true elements of first degree murder or that the jury was wrongly guided by Trial Phase Instruction No. 28 in determining whether the prosecution proved the elements of first degree murder beyond a reasonable doubt.

Additionally, Trial Phase Instruction No. 28 is harmless error because the trial court directed the jury to consider whether the prosecution had met its burden to prove each element of first degree murder in light of the evidence of intoxication presented by the defendant. Under section 18–1–804(1), such evidence is admissible when it is relevant to whether a defendant had the requisite mental state for the charged offense. The trial court never instructed the jury to consider the intoxication evidence only regarding what had been mistakenly described as the defendant's affirmative defense. The jury, we must presume, considered the evidence of intoxication when determining whether the prosecution proved the elements of first degree murder. During the defendant's guilt phase closing argument, the trial court explicitly indicated that the jury could apply evidence of intoxication to the issue of whether the mental state element of first degree murder was proved:

> [DEFENSE:] Now—but he [defendant] did say he was on crack and ... that *allows you to consider intoxication both as an affirmative defense and as it relates to generally deliberation and intention*, just as a general factor.
>
> [PROSECUTION:] Objection, Your Honor. I believe the Court has ruled with respect to deliberation it does not apply.
>
> [DEFENSE:] I recognize that the Court said it did not apply as an affirmative defense but it does apply as part of [the] total circumstances whether a person can deliberate or not.
>
> [COURT:] I'll overrule the objection.

(Emphasis added.) Here the trial court allowed defense counsel to invite the jury to consider intoxication as relevant not only to the affirmative defense, but also to whether Harlan deliberated before killing his victim.

The court's ruling during the defendant's guilt phase closing argument mirrors Trial Phase Instruction No. 30. The trial court explicitly told the jury in this instruction to consider evidence of intoxication "in determining whether the prosecution has prove[d] beyond a reasonable doubt that Mr. Harlan *had the required culpable mental state* for first degree murder (after deliberation)." (Emphasis added.) [14] We conclude that when the jury found that the prosecution had proved all the elements of first degree murder, it could only do so after considering whether intoxication prevented Harlan from having the culpable mental state for first degree murder, including "after deliberation," in accordance with the requirements of

---

**14.** Trial Phase Instruction No. 30 stated in its entirety:

> You have heard evidence of Robert Harlan's use of crack cocaine and alcohol. You should consider this evidence in determining whether the prosecution has proven beyond a reasonable doubt that Mr. Harlan had the required culpable mental state for first degree murder

(after deliberation). ·Unless the prosecution has proven beyond a reasonable doubt that Robert Harlan, if you find him to have been intoxicated, acted after deliberation and with the intent to cause the death of Rhonda Maloney, in causing her death, you must find him not guilty of first degree murder (after deliberation).

section 18–1–804(1). Therefore, the evidence of intoxication served its proper purpose in the guilt phase of Harlan's trial.

### c.

Therefore, we hold that voluntary intoxication does not constitute an affirmative defense. To the extent that prior decisions indicate otherwise, they are disapproved. *See, e.g., People v. DelGuidice,* 199 Colo. 41, 44, 606 P.2d 840, 842 (1979); *People v. Quintana,* 996 P.2d 146 (Colo.App.1998). Despite Trial Phase Instruction No. 28's erroneous statement of the law, nothing in the record suggests that the error contributed to the verdicts rendered against the defendant or undermined the fundamental fairness of his trial. *See Dunlap,* 975 P.2d at 737; *Bogdanov,* 941 P.2d at 253; *Vance,* 933 P.2d at 580. For this reason, we hold that Trial Phase Instruction No. 28 is harmless error.

### B. Specific Intent Element of First Degree Murder

The defendant also claims that the trial court erred by not instructing the jury that "after deliberation" is part of the culpable mental state element of first degree murder that could be negated by evidence of intoxication. The prosecution's burden of proof regarding intoxication, Harlan asserts, was improperly lowered, in violation of his right to require proof of guilt beyond a reasonable doubt of all elements of the charged offense. The trial court refused to so instruct the jury because it held that "after deliberation" is not part of the specific intent element of first degree murder.

We agree with the defendant that "after deliberation" is part of the culpable mental state of first degree murder. However, we find that the failure of the trial court to instruct the jury that "after deliberation" is part of the culpable mental state of first degree murder was harmless error. The trial court directed the jury to consider

whether the defendant killed his victim after deliberating despite his intoxication. The jury therefore determined whether the prosecution proved all the elements of first degree murder, including "after deliberation," in light of the intoxication evidence presented by the defendant.

### 1.

First degree murder after deliberation is a specific intent offense. *See People v. District Court (Henry),* 926 P.2d 567, 570 (Colo.1996). In our view, section 18–3–101(3), 6 C.R.S. (1999), establishes that "after deliberation" is part of the specific intent element of first degree murder.[15] The statute reads in pertinent part:

> The term "after deliberation" means not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act.

*Id.* This statute clearly indicates that the mental state of "after deliberation" includes intent.[16] What makes the mental state required for first degree murder distinctive, therefore, is the context in which the intention is formed—namely, "after the exercise of reflection and judgment."

We consequently disagree with the holding in *People v. Orona,* 907 P.2d 659, 662 (Colo. App.1995). The court of appeals concluded that "after deliberation" is not part of the culpable mental state of first degree murder because "under § 18–3–101(3) the term 'after deliberation' is 'separate from' and 'in addition to' the requisite culpable mental state of 'intentionally.'" *Id.* at 663. The court of appeals also noted that section 18–3–102(1)(a) "specifies that murder in the first degree is committed by a perpetrator who acts both 'after deliberation *and* with intent to cause the death of a person.'" *Id.* (emphasis in original). We do not find this reasoning persuasive for several reasons.

---

**15.** We find additional support for this proposition in our earlier decisions. *See Henry,* 926 P.2d at 570; *Key v. People,* 715 P.2d 319, 322 (Colo.1986).

**16.** Therefore, holding that "after deliberation" is part of the specific intent element of first degree

murder is consistent with section 18–1–501(5), 6 C.R.S. (1999), which states that specific intent offenses are those "in which the mental culpability requirement is expressed as 'intentionally' or 'with intent.'"

First, this interpretation of section 18–3–102(1)(a) creates an unnecessary tension with section 18–3–101(3) because section 18–3–101(3) on its face includes "intentionally" as part of the mental state of "after deliberation." Second, the court of appeals' construction effectively reads out of section 18–3–101(3) the phrase "not only intentionally." This construction therefore violates the principle that a statute should be interpreted so as to give effect to it as a whole. *See People v. Hampton,* 876 P.2d 1236, 1239 (Colo.1994); *see also* § 2–4–201(1)(b), 1 C.R.S. (1999).

Moreover, the conjunction "and" can function, not only to separate discrete items, but to join in a single concept two parts that might otherwise be considered separate. *See Webster's Third New International Dictionary* 80 (1976). Thus "and" operates in section 18–3–102(1)(a) to emphasize that the relevant culpable mental state for first degree murder is the intent to cause the death of another person, formed as a decision made after the exercise of reflection and judgment. The phrase "after deliberation and with intent" does not establish that "with intent" is a distinct element from "after deliberation," but rather that they are part of the same concept.

The interpretation of section 18–3–102(1)(a) in *Orona* also has the inadvertent and unnecessary effect of creating an entirely new, unique, and undefined element of first degree murder. "After deliberation" cannot be part of the actus reus of the offense because it relates to the defendant's mental processes and not the physical acts causing the victim's death. Similarly, it is not an attendant circumstance as the concept is normally understood. *See* Wayne R. Lafave & Austin W. Scott, Jr., *Criminal Law* 7 (1972). It cannot be a general intent mens rea element. *See* § 18–1–501(6), 6 C.R.S. (1999). Relying on section 18–3–101(3) to determine the specific intent element of first degree murder avoids this problem.

For these reasons, we hold that "after deliberation" is part of the specific intent element of first degree murder. To the extent that *Orona* is inconsistent with this position it is disapproved. We now proceed to explain that the trial court's instructions, tak-

en as a whole, do not constitute reversible error even though the court did not unambiguously inform the jury that "after deliberation" is part of the culpable mental state of first degree murder.

2.

 Harlan complains that the trial court failed to completely instruct the jury regarding the mental state elements of first degree murder that could be affected by intoxication. However, the trial court *did* instruct the jury to consider whether intoxication kept the defendant from deliberating before killing his victim. In Trial Phase Instruction No. 30 the court stated:

> You have heard evidence of Robert Harlan's use of crack cocaine and alcohol. *You should consider this evidence in determining whether the prosecution has proven beyond a reasonable doubt that Mr. Harlan had the required culpable mental state for first degree murder (after deliberation).* Unless the prosecution has proven beyond a reasonable doubt that Robert Harlan, if you find him to have been intoxicated, *acted after deliberation and with the intent to cause* the death of Rhonda Maloney, in causing her death, you must find him not guilty of first degree murder (after deliberation).

(Emphasis added.) This instruction does not restrict the jury's consideration of the defendant's intoxication evidence to the issue of whether he intended to kill the victim. The plain meaning of the instruction is that the jury is to determine, in light of the intoxication evidence, whether the defendant deliberated before committing the murder. The last sentence of the instruction tells the jury that unless it finds the prosecution to have proved beyond a reasonable doubt that Harlan deliberated and intended to kill the victim, it must find him not guilty.

The trial court correctly instructed the jury to consider whether evidence of intoxication negated *any* part of the required culpable mental state element for first degree murder. The prosecution's burden to prove

all the elements of first degree murder therefore was not lowered improperly.[17]

## C. The Asportation Element of Second Degree Kidnapping

The defendant also claims that the trial court committed reversible error by failing to instruct the jury properly as to the essential elements of second degree kidnapping. Harlan asserts that the asportation element of this offense is that the victim was moved and that the movement substantially increased the risk of harm to the victim. The trial court did not instruct the jury that the prosecution must prove that Harlan's movement of his victim substantially increased her risk of harm. Thus, according to the defendant, an essential element of the offense was not submitted to the jury, in violation of his rights to due process and to trial by jury. Moreover, because second degree kidnapping is the felony underlying Harlan's conviction for felony murder, he claims that the trial court's instructional error requires overturning the felony murder conviction. Finally, Harlan contends that the unconstitutionally obtained kidnapping conviction was the basis for the jury's finding of two statutory aggravating factors. Therefore, he argues, the death sentence must be reversed.

### 1.

We do not accept the defendant's proposition that substantially increasing a risk of harm to the victim is part of the asportation element of second degree kidnapping. The asportation element of this offense is simply that a person seized and carried another person from one place to another. That the defendant's conduct substantially increased a risk of harm to the victim is not a material element of second degree kidnapping. It is instead a factual circumstance reviewing courts consider in some cases to determine whether there is sufficient evidence to prove that the defendant moved the victim from one place to another. Therefore, the trial court correctly instructed the jury as to the elements of second degree kidnapping.

According to section 18–3–302(1), 6 C.R.S. (1999):

> Any person who knowingly seizes and carries any person from one place to another, without his consent and without lawful justification, commits second degree kidnapping.[18]

Harlan claims that this definition of second degree kidnapping, standing alone, is unconstitutionally overbroad and violates equal protection guarantees. To save the statute, his argument proceeds, this court held in *People v. Fuller*, 791 P.2d 702, 706 (Colo. 1990), that the asportation element is "that the victim was moved and that the movement substantially increased the risk of harm to the victim." Because the trial court did not instruct the jury to that effect, he concludes, an essential element of the offense was not submitted to the jury.

The defendant misreads our prior decisions.[19] We have consistently held that the

---

17. Arguably, Trial Phase Instruction No. 30 indirectly indicates that "after deliberation" is part of the "required culpable mental state for first degree murder (after deliberation)." Even if the instruction does not so identify "after deliberation," the instructions taken as a whole do not constitute reversible error. In either case, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant deliberated prior to killing the victim.

18. In Trial Phase Instruction No. 17, the trial court instructed the jury in essentially identical terms concerning the elements of second degree kidnapping.

19. Harlan relies heavily on our decision in *Fuller*, 791 P.2d at 706, in which we stated:

> To satisfy the elements of second degree kidnapping, substantial movement of the victim is not required. The prosecution must establish that the victim was moved and that the movement substantially increased the risk of harm to the victim.

An isolated and stringently literal reading of this passage may appear to support the defendant's position, but in our view *Fuller* fails to carry his argument. Immediately before this passage, we noted that "[t]he jury in this case was given an instruction on second degree kidnapping that tracked the language of the statute." *Id.* Section 18–3–302(1), as indicated above, does not set forth substantial increase of risk of harm to the victim as an element of the offense. Although the defendant in *Fuller* did not directly attack the propriety of the instructions given at his trial, we would not have implicitly approved an instruction that omitted a material element of the of-

asportation element of second degree kidnapping is that the defendant moved the victim from one place to another. *See, e.g., Apodaca v. People,* 712 P.2d 467, 475 (Colo.1985) ("The statutory definition of second degree kidnapping merely requires movement of the victim from one place to another ....") (internal quotation marks and citation omitted); *People v. Abbott,* 690 P.2d 1263, 1270 (Colo. 1984) ("The defendant in the present case was charged with second degree kidnapping, and thus, 'only movement of the victim from one place to another was required.'") (quoting *People v. Bridges,* 199 Colo. 520, 528 n. 18, 612 P.2d 1110, 1116 n. 18 (1980)); *see also Yescas v. People,* 197 Colo. 379, 381, 593 P.2d 358, 360 (1979). In no prior decision have we said that asportation must include substantially increasing a risk of harm to the victim, and we decline to do so in this case. Otherwise, we would impermissibly encroach upon the prerogative of the General Assembly to define the elements of an offense. *See Rowe v. People,* 856 P.2d 486, 490 (Colo.1993) ("The power to define criminal conduct and to establish the legal components of criminal liability is vested with the General Assembly.").

2.

At times we have considered whether the prosecution has adduced evidence that the defendant's conduct substantially increased a risk of harm to the victim when determining whether the asportation element of second degree kidnapping was proved. However, this analysis does not mean that creating a greater risk of harm is an element of the

offense. In some cases, the factual circumstances presented at trial do not make it clear whether the defendant moved the victim from one place to another. For example, in *Yescas,* 197 Colo. at 380–81, 593 P.2d at 359, the defendant forcefully pulled his victim from a lighted area outside a building to a nearby unlighted area behind a hedge and some trees. We declined to determine whether that movement was "substantial" or "incidental." *See id.* at 381, 593 P.2d at 360. Instead, we held that the asportation element was sufficiently proved if the prosecution proved that the defendant's actions substantially increased the risk of harm to the victim. *See id.* at 382, 593 P.2d at 360; *see also Apodaca,* 712 P.2d at 475 ("[The asportation element] is clearly satisfied when the movement itself, although short in distance, results in a demonstrable increase in risk of harm to the victim."). That is, evidence that the defendant's conduct substantially increased a risk of harm to the victim also may constitute evidence or permit an inference that the defendant moved the victim from one place to another. The functional relevance of this evidence does not, however, entail that the proposition it proves is itself an element of the offense.[20]

3.

Therefore, we affirm here our holding in prior cases that the asportation element of second degree kidnapping is the movement by the defendant of the victim from one place to another. Evidence that the defendant's

fense in the midst of our discussion about that element.

Moreover, Harlan overlooks the context of our discussion in *Fuller.* At issue in that case was whether there was sufficient evidence brought forth by the prosecution to prove the asportation element of second degree kidnapping. The defendant claimed that the prosecution failed to prove this element because it failed to show that his conduct exposed the victim to a substantially greater risk of harm. *See id.* That is, the defendant asserted on appeal that the asportation element—seizing the victim and carrying her from one place to another—had not been sufficiently proved because the prosecution had not adduced evidence that the defendant created a substantially greater risk of harm to the victim. The defendant did not assert that creating such a risk was an element of second degree kidnapping.

**20.** That a substantial increase of risk of harm to the victim is not part of the asportation element of second degree kidnapping is further established by the fact that in some cases we have found it unnecessary to consider whether the defendant's conduct exposed the victim to such a risk. In *Abbott,* 690 P.2d at 1270, we held that the asportation element—which we defined as simply moving the victim from one place to another—was proved on the basis of evidence that the defendant moved his victims from the front of a store into a trailer behind the store. We did not ask whether such movement substantially increased a risk of harm to any of the victims because we viewed the conduct to constitute clear movement of the victims.

actions substantially increased a risk of harm to the victim may be relevant to whether asportation was proved in some cases, but creating such a risk is not an essential element of the offense. Consequently, we hold that the trial court correctly instructed the jury as to the elements of second degree kidnapping.

### D. Attempted Murder of Maloney

Harlan argues that the trial court erroneously failed to merge the conviction for first degree attempted murder of Maloney into the first degree murder conviction. We find that the attempted murder charge, as alleged in the information, is a lesser included offense of the murder charge under the "strict elements" test set forth most recently in *People v. Leske*, 957 P.2d 1030, 1036 (Colo. 1998). Therefore, the defendant is not subject to punishment imposed for the attempted murder conviction in addition to that imposed for the murder conviction. Because the charging documents did not identify the attempted murder of Maloney as distinct from a lesser included offense of the murder of Maloney, we vacate the forty-eight year sentence imposed by the trial court for the attempted first degree murder of Maloney.

### 1.

We begin with a discussion of the principles governing the disposition of this issue. As a broad rule, the General Assembly has provided that "[w]hen any conduct of a defendant establishes the commission of more than one offense, the defendant may be prosecuted for each such offense." § 18–1–408(1), 6 C.R.S. (1999). This principle, however, is subject to several statutory exceptions. *See* § 18–1–408(1)(a)–(e). Under section 18–1–408(1)(a), a defendant may not be subject to multiple convictions for the same criminal conduct if "[o]ne offense is included

in the other, as defined in subsection (5) of this section." According to section 18–1–408(5)(a), an offense is included in another if it is "established by proof of the same or less than all the facts required to establish the commission of the offense charged." *See also Leske*, 957 P.2d at 1036; *People v. Garcia*, 940 P.2d 357, 360 (Colo.1997); *Armintrout v. People*, 864 P.2d 576, 579 (Colo.1993); *People v. Bartowsheski*, 661 P.2d 235, 245 (Colo.1983). In addition to this statutory basis, the Double Jeopardy Clauses of the federal and state constitutions and the judicially created rule of merger bar multiple punishments for greater and lesser included offenses. *See Leske*, 957 P.2d at 1035. We have, however, traditionally resolved claims similar to the one Harlan presents here on exclusively statutory grounds. *See, e.g., Boulies v. People*, 770 P.2d 1274, 1281 (Colo. 1989); *Bartowsheski*, 661 P.2d at 245.

To determine whether section 18–1–408(5) is satisfied, we consistently have applied the "strict elements" test.[21] *See Leske*, 957 P.2d at 1036. According to this test, "if proof of the facts establishing the statutory elements of the greater offense necessarily establishes all of the elements of the lesser offense, the lesser offense is included for the purposes of section 18–1–408(5)(a)." *Id.; see also Garcia*, 940 P.2d at 360; *Armintrout*, 864 P.2d at 579; *Bartowsheski*, 661 P.2d at 245; *People v. Rivera*, 186 Colo. 24, 27, 525 P.2d 431, 433 (1974). While application of the "strict elements" test begins with an examination of the statutes involved in the case, *see Armintrout*, 864 P.2d at 579, we also may consider the charging documents or the judgment of conviction to determine if an offense is lesser included. *See Leske*, 957 P.2d at 1036 n. 8 (citing *Boulies*, 770 P.2d at 1282); *Bartowsheski*, 661 P.2d at 245.

**21.** We have recognized two essential grounds for applying this test. First, it is a means by which to ensure that a defendant is given fair notice of the charges against him. *See People v. Rivera*, 186 Colo. 24, 27, 525 P.2d 431, 433–34 (1974). Second, the doctrine of separation of powers bars a court from imposing multiple punishments for identical criminal conduct unless the legislature expressly authorizes such punish-

ments. *See Rodriguez*, 914 P.2d at 287 (citing *Jones v. Thomas*, 491 U.S. 376, 381, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989)); *Armintrout*, 864 P.2d at 578; *Boulies*, 770 P.2d at 1279; *see also Wilczynski v. People*, 891 P.2d 998, 1001 (Colo. 1995) (stating that the General Assembly possesses constitutional authority to define criminal conduct); *Rowe*, 856 P.2d at 490.

 As a corollary, we do not consider the evidence presented at trial to determine whether the offenses are greater and lesser included. *See Leske,* 957 P.2d at 1034; *Rodriguez,* 914 P.2d at 286; *Armintrout,* 864 P.2d at 579; *Rivera,* 186 Colo. at 27, 525 P.2d at 433. If we were to examine the evidence adduced by the prosecution during Harlan's trial, then we may have been able to conclude that the attempted murder of Maloney was not a lesser included offense of the murder charge. The evidence supports three possible factually distinguishable acts of attempted first degree murder of Maloney. The gun shots fired at Maloney during the chase that culminated in Creazzo's car crashing onto the Thornton Police Department front lawn may be seen as an attempt to murder both Maloney and Creazzo.[22] However, the severe beating Harlan inflicted on Maloney after he pulled her from Creazzo's car, and prior to killing her, might also comprise an attempt to murder her. Finally, the act of shooting Maloney itself may be viewed as a "successful attempt" to kill her. All these events occurred on February 12, 1994. Indeed, because these occurrences are indistinguishable in the charging documents, the "strict elements" test requires merger of the attempted murder and murder charges. An examination of the evidence that might distinguish these scenarios is not part of the "strict elements" test.

If we determine that attempted first degree murder is a lesser included offense under section 18–1–408(5)(a), then, because the General Assembly has not explicitly authorized punishment for both attempted first degree murder and first degree murder, the defendant may not be punished for both offenses. *See Armintrout,* 864 P.2d at 578.

### 2.

Applying the "strict elements" test, we find that the attempted murder of Maloney is a lesser included offense of the first degree murder charge. The attempted murder conviction, therefore, may not form the basis of punishment in addition to that imposed for the murder conviction.

We begin with an examination of the relevant statutes. *See Armintrout,* 864 P.2d at 579. Harlan was convicted of first degree murder after deliberation under section 18–3–102(1)(a).[23] A person is guilty of this offense if "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person." § 18–3–102(1)(a). Under section 18–2–101(1), a "person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of the offense, he engages in conduct constituting a substantial step toward the commission of an offense." It is clear that the elements of attempted first degree murder under section 18–2–101(1) are established by "proof of the same or less than all the facts required to establish" the elements of first degree murder after deliberation under section 18–3–102(1)(a). *See Leske,* 957 P.2d at 1036. The only difference between the two offenses is that first degree murder requires proof of an additional element—namely, that the defendant's actions caused the death of the victim. Examination of the statutory elements of the two offenses, therefore, indicates that attempted first degree murder is a lesser included offense of first degree murder.

Turning now to the charging documents and the judgments of conviction, *see Armintrout,* 864 P.2d at 578, we are satisfied, when our discussion of these documents is combined with the statutory analysis *supra,* that the "strict elements" test is met in this case. The prosecution's amended first count alleged that on or between February 12 and 19, 1994, Harlan committed the first degree murder of Maloney.[24] The prosecution al-

---

**22.** The prosecution argued at trial that these acts constituted the attempted murders.

**23.** The defendant also was convicted of first degree felony murder under section 18–3–102(1)(b), but for purposes of sentencing, the trial court merged this offense with the conviction for first degree murder after deliberation.

**24.** ROBERT S. GRANT, District Attorney within and for the Seventeenth Judicial District of the State of Colorado, in the name and by the authority of the People of the State of Colorado, informs the Court that on or between FEBRUARY 12, 1994 and [FEBRUARY] 19, 1994 at the said County of Adams in the State of Colorado, ROBERT ELIOT HARLAN ... did unlawfully,

leged in its fourth count that the defendant attempted to murder Maloney on February 12, 1994.[25] Both counts iterated the elements of the respective offenses. The jury instructions repeat the information set forth in the charging documents in virtually identical form.[26] *See* Trial Phase Instructions 2, 11, and 13.

Proof of the elements of first degree murder, as alleged in the amended first count, necessarily proves the elements of the attempted first degree murder charge. *See Leske*, 957 P.2d at 1036. The issue, under the "strict elements" test, is not whether evidence actually adduced at trial demonstrates that the attempted murder charge is a lesser included offense of the murder charge. *See id.* at 1034. The fact that the murder is alleged to have occurred between February 12–19, 1994, while the attempted murder is alleged to have occurred on February 12, 1994, does not undermine this conclusion. Any evidence showing that a murder occurred during the time span alleged could include the occurrence of an attempted murder that falls within the narrower included time frame. In other words, the attempted murder was not charged with sufficient specificity to distinguish it from the murder itself. Under our precedent, the "strict elements" test applies and the attempted murder charge is therefore a lesser included offense. Consequently, we vacate the forty-year sentence imposed on Harlan for the attempted first degree murder of Maloney.

## IV. SENTENCING PHASE ISSUES

### A. Pretrial Discovery of Harlan's Expert Witnesses

██ Harlan asserts that the trial court's order requiring pretrial discovery of three sentencing phase expert witnesses impermissibly forced him to choose between exercising his privilege against self-incrimination during the guilt phase of the trial and his due process right to present mitigating evidence in the sentencing phase. The scope of our review of this matter is narrow, as we are concerned only with the propriety of the trial court's discovery and protective orders. Even assuming for the sake of argument, without actually deciding that it does, that Harlan's privilege against self-incrimination in the guilt phase of the trial attached to the sentencing phase expert witnesses' evidence, we find that the trial court's order limiting the prosecution's use of the evidence would have adequately protected Harlan's privilege. Consequently, we hold that the pretrial discovery order was proper.

### 1.

Relying on Crim. P. 16(II)(b), the trial court ordered Harlan to provide the prosecution with discovery by March 27, 1995, one week before the beginning of the guilt phase of his trial, of the mental health experts whom the defense wished to call for mitigation purposes should the trial reach a sentencing phase. Under this order, Harlan was required to provide discovery of any notes, reports, or raw data that the experts had compiled in preparing for the sentencing phase. The trial court also ordered that the prosecution not use the discovery material in framing voir dire questions or for any guilt phase purposes. Harlan maintained that such disclosure would force him to reveal

---

feloniously and after deliberation and with intent to cause the death of Rhonda Maloney, cause the death of Rhonda Maloney.

**25.** AS A FURTHER AND FOURTH COUNT, AND ROBERT S. GRANT, District Attorney as aforesaid, in the name and by the authority of the People of Colorado, further informs the Court that on FEBRUARY 12, 1994 at the said County of Adams in the State of Colorado, ROBERT ELIOT HARLAN ... did unlawfully and feloniously attempt to commit the crime of First Degree Murder by voluntarily engaging in conduct constituting a substantial step toward the commission of the crime, as defined by C.R.S.

§ 18–3–102, in that the defendant did voluntarily perform an act to obtain a result which, if accomplished, would constitute that crime, namely: ROBERT ELIOT HARLAN ... did unlawfully, feloniously and after deliberation and with intent to cause the death of Rhonda Maloney, attempt to cause the death of Rhonda Maloney.

**26.** Similarly, the verdict sheets employed by the jury do not provide any distinction between the offenses such that proof of the first degree murder offense does not also establish proof of the attempted first degree murder offense. *See Boulies*, 770 P.2d at 1282.

privileged[27] and confidential information. The defendant eventually chose not to call these witnesses, thereby precluding the mental health experts' testimony as to potential mitigating factors.

## 2.

Section 16–11–103(1)(c), 8A C.R.S. (1986 & 1994 Supp.), sets forth the procedural requirements for endorsement of Harlan's sentencing phase witnesses.[28] The trial court was authorized to set reasonable timeliness for discovery. Additionally, Crim. P. 16(II)(b) provides that, subject to constitutional limitations, the trial court could order the defense to provide the prosecution with reports or statements of defense experts, including the results of mental examinations.

Harlan chose not to disclose the expert reports and related materials, partly due to a concern that his own witnesses' statements might infringe upon his privilege against self-incrimination during the guilt phase. The trial court realized that its discovery order might infringe upon Harlan's privilege against self-incrimination. It therefore conditioned discovery of Harlan's witnesses by requiring the prosecution to limit use of the material to the sentencing phase:

> THE COURT: If the defendant wishes not to utilize this information and wishes not to utilize the—if the defense decides—makes a determination not to call these witnesses, that's certainly their determination to make and they don't have to provide any of that information to the defense [sic]. If they decide—they make a decision to call these witnesses and disclose the information to the defense [sic] or—I'm sorry—to the prosecution, then that information can only be used by the prosecution in the penalty phase in regard to aggravation and mitigation. And I realize that no other use can be made of it.
>
> . . . .
>
> But it's the court's intention that the information should only be used as the

Court had indicated, at the penalty phase of this trial, if this trial reaches a penalty phase, and should not otherwise be utilized.

Harlan avoided the risk of any improper use of his statements to his proposed sentencing phase witnesses by electing not to comply with the trial court's discovery order. The limitations the trial court placed on the prosecution's use of the discovery materials adequately responded to Harlan's concerns that the evidence not be used before the sentencing phase. We presume, absent evidence to the contrary, that the trial court would effectively enforce its order. Consequently, we find, assuming that Harlan's privilege against self-incrimination during the guilt phase attached to the sentencing phase witnesses' evidence, that the protective order would have sufficiently guarded his privilege.

Because we hold that the trial court's protective order was sufficient to safeguard the defendant's guilt phase privilege against self-incrimination, assuming that the privilege attached to the evidence at issue, we decline to determine here whether in fact the guilt phase privilege applies to evidence that a capital defendant seeks to introduce only during the sentencing phase. Prior decisions of the Supreme Court and this court do not yield a clear answer to that question, and resolution of the defendant's claim here does not require reaching the issue.

In *Buchanan v. Kentucky*, 483 U.S. 402, 422–23, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Supreme Court concluded that:

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evi-

---

**27.** The defendant relied on section 13–90–107(1)(g), 6A C.R.S. (1987 & 1994 Supp.) (setting forth the psychologist or psychotherapist privilege).

**28.** The current section 16–11–103(1)(c), 6 C.R.S. (1999), is substantially the same as the 1994 version, with the exception that discovery occurs upon order of the three-judge sentencing panel rather than order of the trial judge.

dence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

(Internal quotation marks and citations omitted.) *Buchanan* establishes that Harlan can claim no infringement of his privilege against self-incrimination so far as the sentencing phase of his trial is concerned. It is less clear whether *Buchanan* also yields the conclusion that the discovery order did not contravene Harlan's privilege in the guilt phase of the trial. The psychiatric examination at issue in *Buchanan* did not contain *"any* statements by petitioner dealing with the crimes for which he was charged." *Id.* at 423, 107 S.Ct. 2906 (emphasis added). In contrast, Harlan asserts that he made several incriminating statements to at least two of the three mental health experts he sought to present during the sentencing phase.

Moreover, our previous decisions have not squarely addressed whether a defendant's privilege against self-incrimination in the guilt phase is infringed by discovery of sentencing phase material prior to the resolution of the guilt phase. In *People v. Martinez*, 970 P.2d 469, 473 (Colo.1998), we upheld the constitutionality of amended section 16–11–103(3.5)(c), regarding disclosure of written and recorded statements of all witnesses a defendant intends to call at the sentencing phase. However, the challenged materials in that case did not include self-incriminating statements. *See id.* at 471–72.[29] In *People v. District Court (Bellman)*, 187 Colo. 333, 340–41, 531 P.2d 626, 630 (1975), we held that Crim. P. 16(II)(b) does not *facially* violate a defendant's privilege against self-incrimination, while suggesting that material containing such statements might not be subject to a disclosure order.

However, we do not resolve here the question left open by our prior decisions. Again, our concern is only with the propriety of the trial court's discovery and protective orders. The orders were proper because they ensured that the prosecution would make no improper use of the sentencing phase evidence, while also allowing the prosecution a fair opportunity to rebut key sentencing phase evidence the defendant intended to introduce. *See Lanari v. People*, 827 P.2d 495, 499 (Colo.1992) (stating that discovery rules promote fairness in the criminal process "by reducing the risk of trial by ambush").[30] The trial court's order protected any constitutional interest Harlan may have had.

3.

We conclude our discussion of this claim with an observation concerning discovery of a defendant's sentencing phase evidence in future capital cases. A new statute and rule are now in effect regarding the timing of disclosure of defense evidence in the sentencing phase of a capital trial. *See* § 16–11–103(3.5)(c); Crim. P. 32.1(f)(6). Henceforth, the defendant shall provide the prosecuting attorney with discovery materials including those of the type at issue in this case, *see* § 16–11–103(3.5)(c)(I)–(III), no later than twenty days after a verdict of guilty for a death-eligible offense. The intent of the new statute and rule is that a defendant's disclosure of experts and other material subject to discovery is to occur after the guilty verdict for a death-eligible offense has been rendered.

## B. Aggravating Factors

Harlan raises several challenges to the submission of sections 16–11–103(5)(g)[31] and

---

29. Moreover, in *People v. Small*, 631 P.2d 148, 158 (Colo.1981), the evidence at issue did not contain self-incriminating statements.

30. We also find that the trial court's order did not violate Harlan's confidentiality privilege. Expert testimony loses its "cloak of confidentiality" when the defendant endorses a psychiatrist as a witness. This endorsement effectuates a waiver, thereby authorizing disclosure of the psychiatrist's reports and supporting information pursuant to the discovery process. *See Lanari*, 827 P.2d at 499–500.

31. Subsection (5)(g) states, "The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, the defendant intentionally caused the death of a person other than one of the participants."

(5)(k), 6 C.R.S. (1999) [32], as aggravating factors in the sentencing phase. We reject most of his claims, but hold that the trial court erred by failing to provide necessary limiting instructions for each aggravator. However, these errors are harmless because we are persuaded beyond a reasonable doubt that the jury would have imposed a death sentence if it were properly instructed.

### 1.

#### a.

■ Both the Supreme Court and this court have stated that a capital sentencing scheme satisfies the federal and state bans on cruel and unusual punishment only if the discretion of the sentencer is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see also Maynard v. Cartwright,* 486 U.S. 356, 363, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 427–28, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1980); *White,* 870 P.2d at 445–46; *People v. Tenneson,* 788 P.2d 786, 790 (Colo.1990); *People v. District Court (Lohr),* 196 Colo. 401, 405, 586 P.2d 31, 34 (1978). As the Supreme Court explained in *Spaziano v. Florida,* 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), "[i]f a [s]tate has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." The sentencing process must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Tenneson,* 788 P.2d at 790 (internal quotation marks and citations omitted).

■ To achieve these constitutionally indispensable ends, Colorado's capital sentencing scheme depends on the finding of at least one statutory aggravating factor beyond a reasonable doubt by the sentencing body. *See Dunlap,* 975 P.2d at 736; *People v. Young,* 814 P.2d 834, 840 n. 5 (Colo.1991); *Tenneson,* 788 P.2d at 791. However, a death sentence imposed on the basis of a statutory aggravating factor that fails to narrow the class of persons eligible for the death penalty or reasonably justify the imposition of a death sentence, therefore, violates the constitutional ban on cruel and unusual punishment. *See Blystone v. Pennsylvania,* 494 U.S. 299, 306–07, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *White,* 870 P.2d at 446; *Davis,* 794 P.2d at 176.

#### b.

■ The improper submission of an aggravating factor, however, does not by itself require reversal of a defendant's death sentence. Under *Clemons v. Mississippi,* 494 U.S. 738, 753–54, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), it is constitutionally permissible for a reviewing court, after it determines that an aggravating factor was improperly submitted, to consider whether the death sentence nonetheless was fairly and reliably imposed. *See also White,* 870 P.2d at 448; *Davis,* 794 P.2d at 179; *People v. Rodriguez,* 794 P.2d 965, 983 (Colo.1990). *Clemons* established that this analysis may be conducted in at least three possible ways. An appellate court may: (1) independently "reweigh" the valid aggravating factors against the mitigating factors; (2) apply harmless error analysis by asking whether, if the jury had not considered the invalid aggravator at all, it nonetheless would have returned a death sentence; or (3) apply another form of harmless error analysis by determining whether, if the aggravating factor were properly limited, the jury would have found the aggravator and subsequently imposed a death sentence.

---

**32.** Subsection (5)(k) states, "The class 1 felony was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or ef-fecting an escape from custody. This factor shall include the intentional killing of a witness to a criminal offense."

c.

■ Our prior cases might be read to suggest that we are unconstrained in our choice of which *Clemons* analytical framework to apply in determining whether a death sentence was fairly and reliably imposed. *See White*, 870 P.2d at 449; *Davis*, 794 P.2d at 179; *Rodriguez*, 794 P.2d at 983. A careful examination of the function and logical effect of each *Clemons* analytical framework reveals, however, that where, as in this case, the aggravating factor was invalid because it was not properly limited, we should first analyze it under the third *Clemons* option, i.e., by asking whether, if the aggravator were properly limited, the jury would have imposed a death sentence.[33] A narrow concentration of our analysis furthers "close appellate scrutiny of the import and effect of invalid aggravating factors", allowing us to "implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases." *Stringer v. Black*, 503 U.S. 222, 230, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *see also Sochor v. Florida*, 504 U.S. 527, 541, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (O'Connor, J., concurring) (stating that the federal constitution requires a detailed explanation of the grounds on which a reviewing court determines submission of an invalid aggravator to be harmless error). This analytical framework concentrates most directly and narrowly on the trial court's error and, as such, best ensures that an individualized sentencing decision is made.

■ Our prior application of the third *Clemons* analytical framework indicates that we are required to ask two related questions.

First, if the aggravating factor were properly limited, would the jury have found the aggravator beyond a reasonable doubt? Second, if the jury would have found the properly limited aggravator, would it have subsequently imposed a death sentence? *See Davis*, 794 P.2d at 179–80. Only if we can answer the initial question affirmatively do we proceed to consider the second question.[34] If we answer the second question in the affirmative, then we may conclude that the failure to provide a limiting instruction was harmless error.

■ However, if we are unable to conclude beyond a reasonable doubt that the jury would have found the properly limited aggravating factor, then we must proceed to determine whether the jury would have nonetheless imposed a death sentence.[35] Answering this question requires us to move from the third *Clemons* analytical framework to the second. If we conclude that we cannot determine whether the jury would have found the properly limited aggravator, the possible effect of the aggravator in the jury's decision may no longer play a role in our harmless error analysis. We are left, then, to ask the question posed by the second *Clemons* analytical framework: if the jury did not take into account the invalid aggravator, would it have nonetheless imposed a death sentence? *See Clemons*, 494 U.S. at 751, 110 S.Ct. 1441. This determination is logically required by the function of harmless error analysis, which is to determine whether the invalid aggravating factor distorted the jury's decision-making process and led it to impose a death sentence when otherwise it would not have done so.[36]

33. If the aggravator were improper for a reason other than that it was not appropriately limited, e.g., if there were insufficient evidence to support its admission, then the second *Clemons* analytical framework guides our determination. The issue in such a case is whether the jury would have imposed a death sentence if it were not exposed to the invalid aggravator. *See Clemons*, 494 U.S. at 751, 110 S.Ct. 1441.

34. While in *Davis* we explicitly considered only the issue whether the jury would have found the properly limited aggravator, our conclusion that the trial court's error was harmless necessarily requires an implied affirmative answer to the question whether the jury would have imposed a

death sentence if the aggravator were properly limited. *See Davis*, 794 P.2d at 179–80.

35. A determination that we are unable to conclude whether the jury would have found the properly narrowed aggravator is logically independent of the question whether it would have imposed a death sentence.

36. In contrast, the first *Clemons* analytical framework involves essentially setting aside the jury's sentencing decision and imposing our own independent determination of whether a death sentence is appropriate. *See Coe v. Bell*, 161 F.3d 320, 334 (6th Cir.1998). This approach takes us furthest afield from our core task as a

■ Our assessment of what sentence the jury would have imposed, if it had not taken into account the invalid aggravating factor, must be an individualized consideration of the remaining aggravating factors and mitigating evidence. *See Stringer,* 503 U.S. at 230–31, 112 S.Ct. 1130; *see also Richmond v. Lewis,* 506 U.S. 40, 49, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992) ("Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus, if the sentence is to stand."). Our determination, in order to satisfy core constitutional principles, must be grounded in a detailed examination of "the entire record for the presence of factors which potentially influenced the sentence imposed." *King v. State,* 989 S.W.2d 319, 325 (Tenn.1999). We believe it necessary to make specific findings as to these factors, which include, but are not limited to, "the number and strength of remaining valid aggravating circumstances, the prosecution's argument at sentencing, the evidence admitted to establish the [invalid aggravator], and the nature, quality, and strength of any mitigating evidence." *Id.; see also White,* 870 P.2d at 448–52; *Rodriguez,* 794 P.2d at 983–84; *Davis,* 794 P.2d at 180 n. 14.[37] Unless, in light of a fine-grained analysis of these and other relevant factors, we can conclude beyond a reasonable doubt that the jury would have imposed a death sentence if it did not consider the invalid aggravating factor, we are obligated to vacate the death sentence. *See White,* 870 P.2d at 452.

With these principles in mind, we now turn to the challenges Harlan presents to the submission of subsections (5)(g) and (5)(k) as aggravating factors in his trial.

court reviewing a capital sentencing decision, which is to determine whether the evidence supports imposition of the death penalty. *See Willacy v. State,* 696 So.2d 693, 695–96 & nn. 6–7 (Fla.1997).

**37.** A similar examination of these factors is required when applying the third *Clemons* analytical framework.

**38.** In *Dunlap* the defendant alleged there was insufficient evidence to support submission of the

**2.**

We consider here two challenges Harlan presents to the submission of subsection (5)(g); the rest of his subsection (5)(g) claims we address briefly in the Appendix. *See infra* Appendix at Part C.14–16. We reject the defendant's claim that there was insufficient evidence to support submission of the attempted murder of Creazzo as a predicate felony for subsection (5)(g). But we find that the attempted murder of Maloney was improperly submitted to the jury as a possible factual predicate of subsection (5)(g). This error, however, is harmless because we are persuaded beyond a reasonable doubt that the jury, if properly instructed, would have found the aggravating factor and imposed the death sentence.

**a.**

■ Harlan asserts that subsection (5)(g) was improperly submitted because there was insufficient evidence to support the prosecution's argument that Maloney's murder occurred in the course of, in furtherance of, or in immediate flight from the attempted murder of Creazzo. We disagree.

■ We articulated in *Dunlap* the standard for determining whether there is sufficient evidence for submission of an aggravating factor. The issue to be determined upon review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements [of the aggravating factor] beyond a reasonable doubt." *Dunlap,* 975 P.2d at 752 n. 28 (internal quotation marks and citation omitted) (emphasis added).[38] Our review of the rec-

aggravating factor at all. *See id.* at 752–53. In contrast, the question presented here is whether there was sufficient evidence to warrant submitting the attempted murder of Creazzo as a possible predicate felony for the aggravator. We see no reason to apply a different standard of review when considering whether sufficient evidence supported a possible factual predicate of a statutory aggravating factor than when considering whether sufficient evidence supports submission of the aggravator as a whole. Therefore, we apply the *Dunlap* standard here.

ord indicates that this standard is satisfied here.

■ We understand the aggravator to be proved when the predicate class 1, 2, or 3 felony and the intentional killing for which subsection (5)(g) is introduced are part of a continuous transaction. Our analysis of whether a felony properly forms the basis for subsection (5)(g) follows our interpretation of the felony murder statute. Under section 18–3–102(1)(b), we have held that a defendant is guilty of felony murder if the predicate felony and the killing were part of a "continuous integrated" sequence of· events. *People v. McCrary*, 190 Colo. 538, 553, 549 P.2d 1320, 1332 (1976); *see also People v. Morgan*, 637 P.2d 338, 345 (Colo.1981). This interpretation of section 18–3–102(1)(b) is relevant to our discussion of subsection (5)(g) because both statutes require the killing to occur in the course of, in furtherance of, or in immediate flight from another felony. As we noted in *Rodriguez*, 914 P.2d at 284 n. 55, the language of subsection (5)(g) "largely tracks" section 18–3–102(1)(b). The essential difference between the two statutes is that only certain statutorily prescribed felonies may form the basis for felony murder, whereas subsection (5)(g) may encompass any class 1, 2, or 3 felony besides the killing itself. *See id.* This difference, however, is only of the scope of permissible predicate felonies for each statute, and is consistent with employing the same standard for determining whether the killing occurred in the course of, in furtherance of, or in immediate flight from an applicable felony.

The prosecution introduced evidence that, when viewed in a light most favorable to the State, would allow a rational trier of fact to conclude that the attempted murder of Creazzo and Maloney's killing were part of a single continuous transaction. Harlan's attempts to kill both Creazzo and Maloney were closely followed by his kidnapping of Maloney and her eventual murder. No events intervened between the attempted murder of Creazzo and Maloney's death such

that the offenses were not part of a unified course of events. Despite the fact that the attempted murder of Creazzo and Maloney's death occurred at different times and places, a rational trier of fact could conclude that the offenses were part of one continuous transaction. *Cf. Bizup v. People*, 150 Colo. 214, 218, 371 P.2d 786, 788 (1962).

We hold that there was sufficient evidence to allow a rational trier of fact to find that the attempted murder of Creazzo and the murder of Maloney were part of one continuous transaction. *See Dunlap*, 975 P.2d at 752 n. 28. Therefore, the trial court properly submitted the attempted murder of Creazzo as a predicate felony for subsection (5)(g).

b.

■ We next look to the defendant's claim that the conviction for the attempted murder of Maloney was an improper basis upon which to find subsection (5)(g).[39] This conviction merged into the first degree murder conviction, because under the "strict elements" test of section 18–1–408(1)(a), it is a lesser included offense of the first degree murder. *See supra* Part III.D. Thus, the trial court should have instructed the jury that for purposes of sentencing it could not consider the conviction for the attempted murder of Maloney.[40] The verdict form completed by the jury indicates that they found the attempted murder of Maloney as one of the three predicate felonies underlying subsection (5)(g). We must assume that the jury considered this offense in determining whether the aggravating factor was found and the appropriateness of the death penalty. However, we find this error harmless because we are persuaded beyond a reasonable doubt that, if the jury had received a proper limiting instruction, it would have found subsection (5)(g), and subsequently imposed a death sentence.

Because the trial court erred by failing to limit the predicate felonies the jury could consider for subsection (5)(g), we apply the

**39.** The attempted murder of Maloney was one of the three class 2 felonies the prosecution alleged to underlie subsection (5)(g).

**40.** An instruction similar to the one the trial court gave for the felony murder conviction would have been sufficient. *See* Sentencing Phase Instruction No. ˙4.

third *Clemons* analytical framework. Thus, our first inquiry is whether the jury would have found the aggravating factor if it were properly instructed. We believe beyond a reasonable doubt that the jury would have found subsection (5)(g) if given a proper limiting instruction.

At this stage in our application of the third *Clemons* analytical framework, we are in effect asking whether, if the jury had not considered the evidence supporting the attempted murder of Maloney, it is beyond a reasonable doubt that the jury would nonetheless have found subsection (5)(g) based on the evidence supporting the remaining possible predicate felonies—the attempted murder of Creazzo and the second degree kidnapping of Maloney.

We are able to answer this question in the affirmative. During the guilt phase of the trial, the prosecution presented more than enough evidence to establish beyond a reasonable doubt that Harlan was guilty of these offenses. Creazzo's testimony, which formed the core of the prosecution's evidence as to these offenses, essentially was uncontroverted by the defense. During both guilt and sentencing phase closing arguments, defense counsel did not dispute that Harlan kidnapped Maloney. Counsel asserted during guilt phase closing argument that the defendant was not guilty of attempted first degree murder because there was no evidence supporting the mens rea element of first degree murder. The jury, however, rejected this argument and we find nothing in the record to challenge its finding or support defense counsel's contention. Moreover, defense counsel did not dispute the existence of any of the statutory aggravating factors. For these reasons, taken cumulatively, we conclude that the jury would have found the subsection (5)(g) aggravating factor if it were submitted with a proper limiting instruction.

Our inquiry under the third *Clemons* analytical framework, therefore, shifts to the question whether, if the jury found the limited aggravating factor, the jury subsequently would have imposed a death sentence. We also answer this question in the affirmative. Here we consider a number of factors drawn from our examination of the record. *See Rodriguez*, 794 P.2d at 983–84; *King*, 989 S.W.2d at 325. Even if, as we explain below, we cannot conclude beyond a reasonable doubt that the jury would have found the subsection (5)(k) aggravating factor, *see infra* Part IV.B, we believe that the remaining three aggravating factors, including a properly limited subsection (5)(g), are supported by sufficiently strong evidence. Eliminating evidence of the attempted murder of Maloney from the jury's consideration would not appreciably undermine the evidential support for the remaining aggravators. Indeed, subsections (5)(d)[41] and (5)(j)[42] aggravating factors did not relate to the attempted murder of Maloney.

Moreover, the prosecution did not unduly stress the attempted murder of Maloney as a basis for finding subsection (5)(g) during sentencing phase closing arguments. The prosecution mentioned the attempted murder of Maloney only twice—while listing the three class 2 felonies alleged to underlie subsection (5)(g) and then when arguing that the evidence presented established that the defendant had committed all three of the underlying felonies. The prosecution in fact focused on the attempted murder of Creazzo when discussing subsection (5)(g). The prosecution never suggested that the attempted murder of Maloney was a particularly compelling reason either for finding the aggravator or for imposing a death sentence. *Cf. Johnson v. Mississippi*, 486 U.S. 578, 586, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (vacating a death sentence in part because prosecutor repeatedly urged jury to give weight to invalid aggravator in balancing aggravating factors against mitigating evidence).

**41.** Subsection (5)(d) states, "The defendant intentionally killed a person kidnapped or being held as a hostage by the defendant or by anyone associated with the defendant." This aggravating factor was codified at the time of the defendant's trial as section 16–11–103(6)(d), 8A C.R.S. (1986).

**42.** Subsection (5)(j) states, "The defendant committed the offense in an especially heinous, cruel, or depraved manner." This aggravating factor was codified at the time of the defendant's trial as section 16–11–103(6)(j), 8A C.R.S. (1986).

In addition, all the evidence admitted during the guilt phase of the trial to prove the attempted murder of Maloney was properly before the jury. There was, consequently, no danger that the death sentence in this case rested even in part on unfairly prejudicial or otherwise inadmissible evidence. Finally, when we consider the "nature, quality and strength of [the] mitigating evidence" presented by the defendant, *King*, 989 S.W.2d at 325, we remain convinced beyond a reasonable doubt that the jury would have imposed a death sentence if it found the properly limited version of subsection (5)(g).

The nature of the mitigating evidence almost entirely concerned the defendant's lack of prior criminal record, prior good conduct, family history and relationships, and the proposition that he would not be a continuing threat to society if sentenced to life imprisonment. *See* Sentencing Phase Instructions Nos. 12, 16.[43] The quality and strength of this evidence is mixed. While it is true that the defendant did not have a significant prior criminal history, that he had a loving family, and that he had performed good deeds, there was substantial evidence presented by the prosecution that the defendant may pose a continuing threat to society even if imprisoned.

Most importantly, however, none of the mitigating evidence is such that it would likely have been given stronger weight by the jury, or that the jury would have changed its balancing of aggravating factors against mitigating factors, if it did not consider the attempted murder of Maloney as a basis for finding subsection (5)(g). Given the type of mitigation evidence presented by the defendant and the virtually identical sentencing decision-making process the jury would have engaged in if it were properly instructed as to subsection (5)(g),[44] we conclude beyond a reasonable doubt that the jury would have decided that the mitigating evidence did not outweigh the aggravating evidence presented by the prosecution.

When we consider, independently and in the aggregate, those factors in the record that are relevant to an individualized consideration of aggravating factors and mitigating evidence, *see Stringer*, 503 U.S. at 230–31, 112 S.Ct. 1130, we conclude that the jury would have imposed a death sentence in this case if it were properly instructed as to the subsection (5)(g) aggravating factor.

3.

We now turn to Harlan's challenges to the submission of subsection (5)(k) as a statutory aggravating factor. His core argument is that the trial court erroneously failed to provide a limiting instruction concerning the offenses committed prior to the murder that properly could form the factual predicate for subsection (5)(k).[45] As a result, the jury may have interpreted the aggravating factor so that it did not narrow the class of persons

---

**43.** The defendant also presented evidence that he was voluntarily intoxicated, which may have supported the proposition that the role of alcohol or drugs in the offense was a reason not to impose the death penalty. *See* Sentencing Phase Instruction No. 12.

**44.** The only difference in the jury's calculus at trial and the one it would have conducted, if it were properly instructed, is that the jury would not have considered the attempted murder of Maloney as one basis for finding subsection (5)(g).

**45.** Harlan raises tertiary challenges to subsection (5)(k), but they are meritless. First, he asserts that he was unfairly deprived of notice of the factual and legal elements of subsection (5)(k). We rejected this claim as applied to subsection (5)(g), *see infra* Appendix Part C.16, and we do so as well for subsection (5)(k). For both aggravators the defendant had a fair opportunity to rebut

the prosecution's arguments and the prosecution was kept to its burden of proof. This conclusion is consistent with our holding *infra* that the trial court should have instructed the jury which antecedent offenses properly may underlie subsection (5)(k). The error flowing from the lower court's omission was not that the defendant did not have a chance to rebut the prosecution's arguments or that the prosecution's burden of proof was impermissibly lowered, but that the jury may have applied the aggravating factor in an unconstitutionally overbroad manner. Second, the defendant claims that the instructional definitions of "intentional" and "purposeful" are prejudicially inaccurate. The definition of "intentional" given by the trial court is accurate. *See infra* Appendix at Part C.17. We hold here that the definition of "purposeful" was accurate and appropriately channeled the jury's discretion in finding subsection (5)(k) and in its decision to impose a death sentence. *See* Sentencing Phase Instruction No. 9.

eligible for the death penalty or reasonably justify imposition of a death sentence in this case.

The factual circumstances of this case persuade us that a limiting instruction concerning the antecedent offenses that properly may underlie subsection (5)(k) was required. Harlan was convicted of an offense—the attempted murder of Maloney—that may have been construed by the jury in a way that made it inherent or necessarily incident to her murder. As such, we cannot conclude beyond a reasonable doubt that the aggravating factor as submitted to the jury served its constitutionally mandated function to channel the jury's sentencing discretion and to present a principled reason for imposing a death sentence in this case. The trial court's failure to provide a limiting instruction that adequately informed the jury of the possible appropriate factual predicates underlying subsection (5)(k) thus is error.

Our determination that the trial court erred by failing to provide a limiting instruction does not, however, require reversal of the defendant's death sentence. While we are not convinced that the jury would have found the subsection (5)(k) aggravating factor if it were properly instructed, we are convinced beyond a reasonable doubt that, even if the jury had not considered subsection (5)(k) at all, it nonetheless would have imposed the death sentence.

### a.

We begin with a review of our previous discussions of the subsection (5)(k). Our first consideration of the proper scope and application of subsection (5)(k) occurred in *Davis*, 794 P.2d 159. We held that subsection (5)(k) may be properly submitted to the jury only if the evidence tends to show that three conditions are satisfied:

(1) The defendant murdered the victim of a contemporaneously or recently perpetrated offense (i.e., the antecedent offense);

(2) The reason for the murder was to prevent the victim from becoming a witness; and

(3) The antecedent offense was not inherent or necessarily incident to murder.

*See id.* at 187. We observed that by "putting the focus on the *purpose* of the murder, this aggravating factor cannot be said to include all murder victims because they are all potential witnesses." *Id.* (emphasis added).

For that reason, we held that subsection (5)(k) in principle appropriately narrows the class of defendants eligible for the death penalty and reasonably justifies the imposition of a death sentence on a defendant. *See id.* at 187 n. 22. Applying this analysis to the facts presented in *Davis*, we held that the aggravator was properly submitted without a limiting instruction, in part because the defendant was not convicted of any additional offenses that are inherent or necessarily incident to murder. *See id.* at 167, 187.

In *Dunlap*, 975 P.2d at 752–53, we refined our analysis of subsection (5)(k). The defendant alleged that the prosecution had adduced insufficient evidence that he killed his victims to avoid apprehension. *See id.* at 752. We disagreed, concluding that the evidence presented by the prosecution was sufficient to support a conclusion by a reasonable juror that such a purpose was behind the murders. *See id.* at 752–53. In the course of reaching this conclusion, however, we specifically rejected the proposition that, simply because a defendant committed an offense prior to the murder, the murder "was necessarily an effort to prevent arrest" for the prior offense. *Id.* We held that, in addition to evidence of the murder and evidence of the offense to which the victim was a potential witness, the prosecution must present evidence supporting the independent and additional proposition that a purpose of the murder was to avoid apprehension and prosecution. *See id.*

### b.

█ Harlan claims that the trial court erroneously failed to issue a limiting instruction regarding the offenses committed prior to the murder of Maloney that properly may form the factual predicate of subsection (5)(k). The defendant asserts that this issue was preserved below by objection presented to the trial court. Our review of the record establishes that the issue was not preserved

below by contemporaneous objection and is presented for the first time in this appeal. Consequently, we assess the claim under a plain error standard of review. *See People v. Rodgers*, 756 P.2d 980, 983–84 (Colo.1988); *see also* Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *Dunlap*, 975 P.2d at 737 (stating that plain error review applies even to capital cases); *Davis*, 794 P.2d at 189 (same).

 Normally, under plain error review, reversal is required only if the error "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Walker v. People*, 932 P.2d 303, 311 (Colo.), *cert. denied*, 522 U.S. 883, 118 S.Ct. 212, 139 L.Ed.2d 147 (1997); *see also Harris v. People*, 888 P.2d 259, 267 (Colo.1995); *Davis*, 794 P.2d at 189; *Rodgers*, 756 P.2d at 984. However, if the issue raised is of constitutional dimension, then "reversal is required unless this court is convinced beyond a reasonable doubt that the error is harmless beyond a reasonable doubt." *Davis*, 794 P.2d at 189; *see also Rodgers*, 756 P.2d at 984; *Graham v. People*, 705 P.2d 505, 509 (Colo.1985).

The issue Harlan presents is of constitutional dimension. We have held that subsection (5)(k) narrows the class of defendants eligible for the death penalty and reasonably justifies imposition of a death sentence only if the antecedent offense is not inherent or necessarily incident to murder. *See Davis*, 794 P.2d at 187 n. 22. Otherwise, a death sentence imposed even partly on the basis of subsection (5)(k) would violate the constitutional guarantee against cruel and unusual punishment. *See id.* Therefore, while we review the defendant's claim under the plain error standard of review, we must reverse his death sentence unless we are convinced beyond a reasonable doubt that the trial court's error in failing to provide a limiting

instruction for the subsection (5)(k) aggravating factor was harmless. *See Davis*, 794 P.2d at 189; *Rodgers*, 756 P.2d at 984; *Graham*, 705 P.2d at 509.

### c.

 We hold that Harlan was entitled to a limiting instruction concerning the antecedent offenses that properly may form the factual predicate for subsection (5)(k). The defendant was convicted of an antecedent offense—the attempted murder of Maloney—that reasonably could have been interpreted by the jury in a way that made the offense inherent or necessarily incident to the murder of Maloney. Thus, subsection (5)(k) failed to perform its constitutionally mandated function of narrowing the class of persons eligible for the death penalty. *See Davis*, 794 P.2d at 187 n. 22; *see also Zant*, 462 U.S. at 877, 103 S.Ct. 2733.

The prosecution argued that the attempted murder of Maloney occurred when Harlan fired several gunshots into Jaquie Creazzo's car while Creazzo and Maloney were attempting to flee him. Under this specific factual scenario, the attempted murder properly may form the factual predicate for subsection (5)(k), because the attempted murder clearly is severable, by the evidence presented at trial, from the murder itself. The attempted murder of Maloney, so construed, is not inherent or necessarily incident to the murder.

 However, it is also true that nothing in the trial court's instructions prevented the jury from construing the attempted murder of Maloney so as to form an improper factual predicate for subsection (5)(k). In short, while we know what facts the prosecution asserted to constitute the attempted murder of Maloney, we cannot with sufficient confidence conclude that all members of the jury also believed the same facts to constitute the offense.[46] The trial court's failure to provide

46. It is only apparently inconsistent for us not to consider the evidence presented at trial when determining whether the attempted murder of Maloney was a lesser included offense of the murder charge, *see supra* Part III.D, while at the same time reviewing the evidence to determine whether the jury may have improperly applied

subsection (5)(k). The "strict elements" test which governs our merger analysis does not require a consideration of the evidence presented at trial, *see, e.g., Leske*, 957 P.2d at 1034, whereas it is possible to conclude whether the jury may properly have found a statutory aggravating factor only by reviewing the evidence presented in

a limiting instruction allowed the jury to conclude that the horrible beating Maloney suffered after she was taken from Creazzo's car, and before she was killed, constituted an attempt to murder her. The jury reasonably could have viewed the duration and severity of the beating, and the number of injuries inflicted on Maloney, as a "substantial step" to killing her. See § 18–2–101(1). It also is possible that the jury reasonably may have viewed the act of shooting Maloney itself as a "successful attempt" to murder her.

Under either scenario, the attempted murder is factually integral to the murder itself and thus an improper basis for finding subsection (5)(k) as an aggravating factor. We need not determine whether the jury in fact construed the attempted murder of Maloney in an inappropriate fashion for the purpose of determining whether the prosecution had proved subsection (5)(k). There is a sufficient possibility, given the factual circumstances of this case, that at least some members of the jury may have incorrectly construed the factual predicate of subsection (5)(k), for us to find the necessity of a limiting instruction here. See Godfrey, 446 U.S. at 428–29, 100 S.Ct. 1759; see also id. at 436–37, 100 S.Ct. 1759 (Marshall, J., concurring); Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (stating that in reviewing a challenged instruction, the Supreme Court will "inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution") (internal quotation marks and citations omitted); Davis, 794 P.2d at 177 (stating that this court will not automatically assume that, in the absence of a necessary limiting instruction, the jury correctly applied a statutory aggravating factor). Moreover, the fact that Harlan was convicted of additional offenses that clearly cannot be inherent or necessarily inherent to the murder of Maloney does not lessen sufficiently the possibility that the jury may have applied the aggravating factor in a constitutionally improper manner.

Therefore, we conclude that the trial court erred by failing to instruct the jury as to which antecedent offenses properly may form the factual predicate for the subsection (5)(k) aggravating factor. Our inquiry now turns to whether this error was harmless beyond a reasonable doubt.

### d.

Because the trial court failed to provide a necessary limiting instruction, we apply the third Clemons analytical framework. Our first inquiry is whether the jury, if properly instructed regarding the attempted murder of Maloney, would have found the aggravating factor. We cannot find beyond a reasonable doubt that the jury would have found subsection (5)(k) if it were properly limited.

The basis for our conclusion is the paucity of evidence supporting the proposition that the defendant murdered his victim for the purpose of preventing her from being a witness to, among other offenses, his earlier attempt to murder her. While we reject the defendant's assertion that there was insufficient evidence presented at trial to justify submission of subsection (5)(k), we cannot conclude that the prosecution presented enough evidence of the purpose of the defendant's murder of Maloney for the jury to have found subsection (5)(k) on a properly limited basis. Whether there was sufficient evidence to warrant submitting subsection (5)(k) is, as we have seen, whether any rational trier of fact, when the evidence is viewed in the light most favorable to the prosecution, could have found that the aggravator existed beyond a reasonable doubt. See Dunlap, 975 P.2d at 752 n. 28. This threshold is significantly lower than the standard that must be met for this court to conclude that the jury would have found the properly limited version of subsection (5)(k). To make the latter determination, we must be able to identify evidence establishing, not merely that it was possible for the jury to have found the aggravator, but that it is

support of the factor. See White, 870 P.2d at 447–48; Davis, 794 P.2d at 179–80, 187–88; Rodriguez, 794 P.2d at 983–84. Statutory aggravating factors relate to the factual circumstances that potentially make an offense death-eligible; an examination of whether a given aggravating factor has been proved therefore turns on a consideration of the evidence presented.

beyond a reasonable doubt that the jury in fact would have found subsection (5)(k). *See Davis,* 794 P.2d at 180 & n. 14.

■ As we stated in *Dunlap,* 975 P.2d at 752–53, the prosecution must present evidence, in addition to that evidence proving the antecedent offense and the murder of the victim, that a purpose of the killing was to prevent arrest. When we consider the evidence of the defendant's purpose in killing Maloney that is consistent with construing the attempted murder of Maloney as not inherent or necessarily incident to her murder, we are not convinced beyond a reasonable doubt that the jury would have found subsection (5)(k).[47]

When the defendant pulled Maloney from Creazzo's car, he said to her, "You thought you were going to get away, bitch, didn't you?" One rationally permissible interpretation of that statement is that the defendant was not going to allow Maloney to escape from him and inform authorities of the various criminal acts he had committed up to that point. That interpretation, which is not the only plausible reading of the statement,[48] allows, but does not compel, the inference that Harlan eventually killed Maloney to keep her from being a witness against him. Similarly, the fact that the defendant was aware that Creazzo's car had crashed on the Thornton Police Department lawn lends a measure of support for the proposition that a reason he killed Maloney was to prevent her from communicating the fact of his offenses to the police.

Finally, the fact that the defendant attempted to destroy or scatter incriminating physical evidence following Maloney's death is consistent with, but does not require, the inference that he killed Maloney to prevent her from being a witness against him for offenses committed before he killed her. Both the efforts to eliminate physical evidence against him and the killing of Maloney

might be viewed as part of a comprehensive effort to evade apprehension. However, it is also possible to view his efforts to hide or destroy physical evidence as only an effort to avoid detection for Maloney's death. Such efforts did not begin until after Harlan had killed Maloney. This fact undercuts to some extent the inference that, because the defendant attempted to eliminate incriminating physical evidence linking him to her murder, he also killed Maloney to escape detection for earlier criminal offenses.

This evidence, taken cumulatively, justifies submission of subsection (5)(k) under the *Dunlap* sufficiency of evidence standard and it is consistent with the attempted murder of Maloney charge as properly limited under *Davis.* However, we cannot conclude beyond a reasonable doubt that, on the basis of this evidence, the jury would have found the aggravating factor. Therefore, we must shift our focus from the third to the second *Clemons* analytical framework and determine whether, if the jury had not considered subsection (5)(k), it is beyond a reasonable doubt that the jury nonetheless would have imposed a death sentence. Our review of the record establishes that the jury would have imposed a death sentence under those circumstances.

Our assessment of what sentence the jury would have imposed if it had not taken into account subsection (5)(k) must be an individualized consideration of the remaining aggravating factors and mitigating evidence. *See Stringer,* 503 U.S. at 230–31, 112 S.Ct. 1130. We look to the entire record to identify factors that may have influenced the sentence imposed, including "the number and strength of remaining valid aggravating [factors], the prosecution's argument at sentencing, the evidence admitted to establish the [invalid aggravator], and the nature, quality, and strength of any mitigating evidence."

---

47. It is true that the prosecution adduced evidence sufficient to prove beyond a reasonable doubt that Harlan committed numerous offenses before he murdered Maloney. This proof, however, is not adequate by itself also to prove subsection (5)(k) beyond a reasonable doubt. In *Dunlap,* 975 P.2d at 752–53, we rejected the inference that, because a defendant commits an offense to which his eventual murder victim was a witness, he necessarily killed his victim to prevent arrest.

48. For example, the defendant may only have meant that Maloney was not going to escape further abuse from him.

*King,* 989 S.W.2d at 325; *see also Rodriguez,* 794 P.2d at 983–84.

Looking first to the number and strength of the remaining valid aggravating factors, we find that the prosecution presented substantial proof for three additional statutory aggravating factors: subsection (5)(d) (intentionally killing a person kidnapped by the defendant); subsection (5)(g) (intentionally causing the death of a person in connection with the commission of a class 1, 2, or 3 felony); and subsection (5)(j) (the murder was committed in an especially heinous, cruel, or depraved manner). The evidence establishes beyond a reasonable doubt all three aggravating factors, but subsection (5)(j) is supported by especially strong evidence. The Supreme Court has stated that "a particular set of facts surrounding a murder, however shocking they might be" are not themselves, "without some narrowing principle," sufficient to warrant the imposition of the death penalty. *Maynard,* 486 U.S. at 363, 108 S.Ct. 1853. However, subsection (5)(j) was properly limited in this case by jury instructions. Moreover, the facts supporting subsection (5)(j) in this case are sufficient, even without taking into account subsection (5)(d) and (5)(g), for the jury to have imposed a death sentence.[49]

During sentencing phase closing argument, the prosecution did not unduly stress subsection (5)(k) as a basis for sentencing Harlan to death. The remarks concerning subsection (5)(k) were truncated, consisting mainly of rhetorical questions concerning what the defendant's purpose in killing Maloney must have been, and cursory, particularly when compared to the substantial and far-reaching argument offered concerning subsections (5)(d) and (5)(j). Not only did the prosecution not highlight subsection (5)(k) as a basis for imposition of the death sentence; this aggravator received the least attention during the sentencing phase of the four statutory aggravating factors submitted to the jury. *Cf. Johnson,* 486 U.S. at 586, 108 S.Ct. 1981. Furthermore, the evidence admitted supports that subsection (5)(k) was properly be-

fore the jury. There was, consequently, no danger that the finding of the aggravator or the imposition of the death sentence in this case rested even in part on unfairly prejudicial or otherwise inadmissible evidence.

Finally, we consider the mitigating evidence presented by the defendant. Having already noted that the quality and strength of the mitigating evidence is mixed, *see supra* Part IV.B.2, we observe that none of the evidence in mitigation would have been given greater weight by the jury if it did not consider subsection (5)(k). Moreover, due to the relative insignificance of evidence supporting subsection (5)(k) and the substantial evidence supporting the remaining statutory aggravating factors, we find no reason to conclude that the jury would have changed its balancing of aggravating factors against mitigating evidence if it had not considered subsection (5)(k). Given the type of mitigating evidence presented by the defendant and the strength of the remaining aggravating factors, we conclude beyond a reasonable doubt that the jury would have decided that the mitigating evidence offered by Harlan did not outweigh the aggravating factors presented by the prosecution.

When we consider, independently and collectively, those factors in the record that are relevant to an individualized examination of aggravating factors and mitigating evidence, we conclude that the jury would have imposed a death sentence in this case if subsection (5)(k) had not been submitted to it. Therefore, we find the trial court's failure to provide a limiting instruction concerning the predicate offenses of the aggravator to be harmless error.

### C. *Dunlap* Issues

The defendant raises a cluster of sentencing phase issues that are fully resolved by our analysis in *Dunlap,* which was decided after his trial. Therefore, we address these and closely related claims together.

---

**49.** We again note the defense did not dispute the existence of any of the statutory aggravating factors.

#### 1.

Harlan contends that the trial court committed reversible error in admitting evidence of his prior sexual misconduct as a nonstatutory aggravating factor to rebut mitigating factors he asserted during the sentencing phase of the trial. Moreover, the defendant asserts that the trial court erred by failing to exclude this evidence under CRE 401–403. We do not agree.

#### a.

We first address Harlan's contention that evidence of his prior sexual misconduct constituted impermissible nonstatutory aggravating factor evidence. We considered and rejected a similar argument in *Dunlap*, 975 P.2d at 739–40.

Under Colorado's capital sentencing statute, the jury decides whether the defendant is eligible for the death penalty by weighing aggravating factors against mitigating evidence. *See id.* at 739. This determination comprises the first three steps in the decision-making process, during which "the jury may consider (1) evidence related to statutory aggravating factors; (2) all mitigating evidence; and (3) *prosecution evidence offered to rebut mitigating factors raised by the defendant*." *Id.* (emphasis added). We find that evidence of the defendant's prior sexual misconduct was admissible to rebut mitigating factors that the defendant himself raised during the sentencing phase of the trial.

The prosecution presented the testimony of five women regarding Harlan's prior sexual misconduct. The evidence is as follows.

Terrilynn Carlson testified that when she was at Sandra Harlan's house, before Sandra Harlan and the defendant were married, she became ill and went to the bathroom. Harlan followed her into the bathroom, locked the door, unzipped his pants, and made sexual remarks to her. He grabbed her and put her mouth on his penis, but Carlson pulled away and threw up. Harlan left the bathroom. Because she was still sick, Carlson slept at Sandra Harlan's home, only to awaken with the defendant on top of her. She told him she would scream and put up her knees in defense, at which point Harlan again retreated.

Tracie Schoenberger testified that Harlan asked her to kiss him while they were at work. She refused, saying, "No. I guess you don't always get what you want, Robert." He responded, "I always get what I want," and placed his hand on her back beneath her blouse. Laura Jennings testified that Harlan tied her up and sexually assaulted her for two hours at his grandmother's house in 1991. Following a mistrial on felony sexual assault charges, Harlan accepted a plea bargain, and was convicted of third degree sexual assault, a misdemeanor.

Colleen Harlan testified that in October 1990, after their divorce, she sat in a parked car with the defendant, and he told her "[t]hat he drove around at night looking for—excuse me—looking for women walking alone so that he could think of ways to rape and kill them and get away with it." She also testified that Harlan told her in a telephone conversation in 1989 that an automobile accident that had occurred five years earlier while she was a passenger in the car he was driving was actually an attempt to kill her, because he "didn't think I loved him any more and if he couldn't have me, no one else could." [50]

The trial court instructed the jury that this testimony was admitted only for the purpose of rebutting certain mitigating evidence of the defendant:

> During the penalty phase of this trial, the Court admitted certain evidence for a limited purpose. The testimony from Terilynn [sic] Carlson, Traci [sic] Schoenberger, Laura Jennings and Colleen Harlan was admitted *solely* for the purpose of

---

**50.** In addition, Jami Taylor testified that in 1992 Harlan took her to his parents' home when they were out of town. When there, he pushed her down on a bed and tried to open her legs. Taylor stated that Harlan told her that "he wanted to screw me in my ass." Taylor pushed him away and made him take her home. The trial court later struck all of Taylor's testimony based on a discovery violation and instructed the jury to disregard her testimony. *See infra* Appendix Part C.4.

rebutting the following specific mitigating factors:

1. The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

2. The influence of drugs or alcohol.

3. The defendant is not a continuing threat to society.

4. Any factor, or factors, listed in Instruction 16, upon which you think this evidence may have any bearing.

*You may consider the testimony from those four witnesses for this limited purpose and for no other purpose whatsoever.*

If you, as an individual juror, determine that the evidence you heard from those witnesses has any bearing on the issue of mitigation, then you may consider the evidence for the limited purpose of determining whether the specific mitigating factors, listed above, exist or what weight to give those specific mitigating factors, if they exist, in the third and fourth steps of your deliberations. *You cannot consider the testimony from those witnesses as an aggravating factor.*

Sentencing Phase Instruction No. 22 (emphasis added). In addition, prior to the testimony of each of these prosecution witnesses, the trial court admonished the jury that they could only consider the testimony of the witness for the limited purpose of rebutting specific mitigating factors, and for no other purpose. We find that the trial court's instructions adequately guided the jury's consideration of the prosecution's rebuttal evidence. *See Dunlap,* 975 P.2d at 742–43.

We hold that the sexual misconduct evidence was relevant to rebut the statutory mitigating factor that the defendant is not a continuing threat to society. *See* § 16–11–103(4)(k).[51] The defendant presented extensive evidence that he would not be a continuing threat to society if he were sentenced to life imprisonment. The trial court qualified Dr. Michael L. Radelet, one of Harlan's sentencing phase witnesses, as an expert in sociology, criminology, and predictability of future dangerousness. Dr. Radelet defined "dangerousness" as "serious assaultive conduct which is reasonably likely to cause significant bodily injury to the victim so that what I'm looking for is significant bodily injury." After considering eight factors—the presence of remorse; whether the crime was impulsive rather than premeditated; Harlan's age at the time of the crime; prior felony convictions; history of psychosis or mental hospitalizations; institutional adjustment to confinement; the alternative to a death sentence which in Colorado is life without parole; and the social support of family and friends—Dr. Radelet testified that he believed

> that Mr. Harlan has an extremely high probability of being able to make a satisfactory adjustment to prison. All of the factors that I've outlined and when compared with other people convicted of aggravated murder, make him a very, very safe bet in my opinion for being able to have a prison term rather than being sentenced to death.

On cross-examination, however, Dr. Radelet acknowledged that the best predictor of future behavior was past behavior. He also agreed with the prosecutor that the Laura Jennings assault "was a horrible, horrible incident." Dr. Radelet also testified as to the incidents involving Terrilynn Carlson, Tracie Schoenberger, Laura Jennings, and Colleen Harlan. While he contested the weight that these incidents should be given in determining future dangerousness, he did not testify that they were irrelevant to that issue. The jury reasonably could have viewed the evidence of sexual misconduct as relevant to the issue of the defendant's future threat to society. Therefore, the trial court properly admitted it in rebuttal of the defendant's evidence on that question. *See Dunlap,* 975 P.2d at 739.

We conclude, moreover, that the jury reasonably could have found that the sexual misconduct evidence was relevant to some of the nonstatutory mitigating factors set forth

---

51. We express no opinion on whether the sexual misconduct testimony was also relevant to rebut the other statutory mitigating factors set forth in Sentencing Phase Instruction No. 22.

in Sentencing Phase Instruction No. 16. For example, the defendant's mitigating factor 12 stated, "For most of Robert Harlan's life he has been law abiding and a positive member of society." Factor 19 provided, "The Robert Harlan that [his father] knows is a good man. Belt Harlan believes that his son's violent acts are due to drugs. And, although the use of drugs does not excuse Robert's actions, the use of drugs explains, at least in part, how a good man could do something so wrong." A juror could reasonably conclude that the sexual misconduct evidence was relevant to the weight to be given these mitigating factors. Similarly, many of Harlan's witnesses testified that they were shocked when they heard what he was charged with, and that it did not comport with the person they knew. *See, e.g.,* Sentencing Phase Instruction No. 16, factors 41, 53, 63, 65, 66, and 70. It was proper for the jurors to consider the prosecution's rebuttal evidence insofar as it related to the credibility of these witnesses and the weight to give the nonstatutory mitigating factors that Harlan submitted.

In sum, the evidence of Harlan's prior sexual misconduct was properly admitted to rebut evidence of mitigating factors that the defendant submitted to the jury. *See Dunlap,* 975 P.2d at 739. The jury was carefully instructed as how to consider this evidence and we presume that those instructions were followed. *See id.* at 743. Therefore, we deny the defendant's claim.

#### b.

Harlan also alleges that the evidence should have been excluded under CRE 401–403. We have already found that this evidence was relevant to mitigation issues Harlan raised during the sentencing phase. Therefore, CRE 401 and 402 are satisfied.[52]

 We conclude here that evidence of the defendant's sexual misconduct is ad-

missible under CRE 403.[53] Trial courts have broad discretion to make evidentiary determinations under CRE 403. *See Dunlap,* 975 P.2d at 741; *People v. Ibarra,* 849 P.2d 33, 38 (Colo.1993). "A determination that the probative value of evidence outweighs prejudice to the defendant is left to the discretion of the trial court and will not be overturned on appeal in the absence of an abuse of discretion." *People v. Czemerynski,* 786 P.2d 1100, 1108 (Colo.1990). We will reverse the trial court's CRE 403 ruling only if the decision is "manifestly arbitrary, unreasonable, or unfair." *King v. People,* 785 P.2d 596, 603 (Colo.1990). In determining whether the trial court abused its discretion, we evaluate the trial court's decision by considering the maximum probative value of the evidence as weighed against the minimum prejudicial effect. *See People v. Gibbens,* 905 P.2d 604, 607 (Colo.1995). This is a very deferential standard of review because CRE 403 strongly favors admission of relevant evidence. *See id.*

Under these principles of review, we find no abuse of discretion in the trial court's decision to admit the sexual misconduct evidence. The evidence of sexual misconduct from several witnesses reveals a pattern of physically intimidating and often dramatically violent behavior toward women. Under the *Gibbens* standard, we cannot conclude that the trial court's decision was "manifestly arbitrary, unreasonable, or unfair." *King,* 785 P.2d at 603. Our review of the record compels this conclusion, even if we, if in the trial court's position, may have excluded some or all of the evidence under CRE 403 due to its potential for injecting improper racial considerations into the jury's decision-making process. *See infra* Part V.B.

#### 2.

Harlan next raises several issues concerning the role of nonstatutory aggravating fac-

---

**52.** CRE 401 defines relevant evidence as that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." According to CRE 402, relevant evidence is admissible, subject to constitutional, statutory, or other restrictions.

**53.** According to CRE 403, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

tors. We conclude that they are all without merit in light of our analysis in *Dunlap*, 975 P.2d at 740–41.

### a.

In *Dunlap*, 975 P.2d at 740, we held that evidence of nonstatutory aggravating factors is admissible in a capital sentencing hearing, but the jury may only consider it in the final step of their deliberations. We found that the scope of admissible evidence for purposes of this step of the sentencing process is set forth in section 16–11–103(1)(b):

"All admissible evidence presented by either the prosecuting attorney or the defendant that the court deems relevant to the nature of the crime, and the character, background, and history of the defendant, including any evidence presented in the guilt phase of the trial, and any matters relating to any of the aggravating or mitigating factors enumerated in subsections (4) and (5) of this section may be presented. Any such evidence which the court deems to have probative value may be received, as long as each party is given an opportunity to rebut such evidence."

*See Dunlap*, 975 P.2d at 740 (quoting § 16–11–103(1)(b)).

We held that "the admissibility of rebuttal mitigation evidence for purposes of *Tenneson* step four is constrained only by familiar evidentiary principles concerning the relevance of the evidence and the potential for that evidence to inflame the passion or prejudice of the jury." *Id.* at 741.

### b.

■ The defendant first claims that the trial court erroneously refused to instruct the jurors that the fourth step of their sentencing decision-making process had to be based solely on the statutory aggravating factors and the mitigating factors introduced during the sentencing phase. He asserts that this refusal wrongly allowed the jurors to consider during the final stage of their deliberations nonstatutory aggravating evidence as reasons to impose the death penalty.

In the present case, the trial court did not allow the jury to consider nonstatutory aggravating factors in a way that is fundamentally inconsistent with our reasoning in *Dunlap*. If anything, the trial court's treatment of nonstatutory aggravating factors worked to the defendant's benefit. Sentencing Phase Instruction No. 5 provides as follows:

If all of the jurors unanimously agree that they are each convinced and persuaded beyond a reasonable doubt that the mitigating factors do not outweigh the specified aggravating factors, each juror will then decide, based on the mitigation and specified aggravating factor or factors, whether they are convinced beyond a reasonable doubt that death, rather than life, is the appropriate sentence. If any one or more of the jurors is not convinced beyond a reasonable doubt that the appropriate sentence is death, instead of life in prison, the jury must return a sentence of life in prison, without possibility of parole.

*See also* Sentencing Phase Instruction Nos. 18 and 19. The "specified aggravating factor," for the purposes of Sentencing Phase Instruction No. 5, is a statutory aggravating factor. *See* Sentencing Instruction No. 6. Moreover, the jury was instructed that it could not consider any of the prosecution's mitigation rebuttal evidence as an aggravating factor. *See* Sentencing Phase Instruction No. 22.

Therefore, the jury was shielded from considering nonstatutory aggravating evidence in its sentencing deliberations as an independent basis for imposition of a death sentence. The nonstatutory aggravating factors functioned solely as rebuttal evidence to the defendant's mitigating factors. The jury, we note, was not instructed that it could consider nonstatutory aggravating evidence in the fourth step of their deliberations, although section 16–11–103(1)(b) allows such evidence to play a role at that stage. *See Dunlap*, 975 P.2d at 741. Therefore, in effect, the trial court kept from the jury aggravating evidence that we held in *Dunlap* was relevant to the final stage in the capital sentencing process. This error certainly could not prejudice the defendant; thus, Harlan's claim is denied.

c.

■ Harlan also alleges that the trial court should have instructed the jurors that they had to unanimously find the existence of nonstatutory aggravating factors before they could be considered for any purpose. We reject this argument for two reasons. First, the court did not affirmatively instruct the jury that it could consider nonstatutory aggravating evidence at the fourth step of the sentencing process, although the trial court could have. *See Dunlap*, 975 P.2d at 741. Second, the only requirement of unanimity imposed by section 16–11–103 in the final step of the sentencing process is that all of the jurors must be convinced, beyond a reasonable doubt, that death, rather than life, is the appropriate sentence. *See Tenneson*, 788 P.2d at 796. There is no additional requirement that the jury be unanimous as to the basis for that determination. Consequently, the trial court did not err when it refused the defendant's instruction to the contrary.

## V. INDEPENDENT REVIEW

■ We are obligated by statute to independently review on two separate bases the defendant's death sentence. *See* § 16–11–103(6)(a), (b). Meaningful independent appellate review is essential "in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). Only if we are satisfied, keeping in mind the qualitative uniqueness of the death penalty, *see Mills*, 486 U.S. at 376, 108 S.Ct. 1860; *Dunlap*, 975 P.2d at 735, that the sentence is permissible under both forms of independent review will we affirm the death sentence. While certain features of this case cause us concern, our independent review as a whole leads us to affirm the imposition of the defendant's death sentence.

### A. Appropriateness

■ Section 16–11–103(6)(a) requires us to determine the appropriateness of the defendant's death sentence, "with regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy

of the information on which it was based." Taking into account each of these factors, we conclude that the death sentence in this case meets our propriety review under section 16–11–103(6)(a).

Turning first to the nature of the offense, we stress that the crime underlying the death sentence was exceptionally brutal. Harlan repeatedly raped Maloney, a woman much smaller and weaker than he, over the course of approximately two hours. Once she escaped him, the defendant pursued her and Creazzo—whom the defendant permanently injured—until he was able to kidnap Maloney. Harlan then beat Maloney severely, causing several skull and facial fractures as well as other injuries. After rendering her wounded and helpless, the defendant killed his victim with a gunshot wound to the head.

Moreover, our examination of the offense's nature shows that the prosecution proved at trial three statutory aggravating factors. As to the subsection (5)(g) aggravating factor regarding death caused during the course of, in furtherance of, or in immediate flight from a class 1, 2, or 3 felony, the evidence showed that Harlan attempted to murder Creazzo and kidnapped Maloney before killing her. This evidence also supports the subsection (5)(d) aggravating factor regarding the intentional killing of a person kidnapped by the defendant. Finally, in support of the subsection (5)(j) aggravating factor regarding the commission of the crime in an especially heinous, cruel, or depraved manner, the evidence showed that Harlan severely and repeatedly abused Maloney before killing her. His actions clearly were conscienceless and unnecessarily torturous. *See Davis*, 794 P.2d at 176–77.

In light of the duration during which the defendant terrorized his victim and her would-be rescuer; the degree of violence he inflicted on Maloney before her death; and the extent to which she suffered, we conclude that the nature of the defendant's offense is comparable to cases in which we have upheld the propriety of a death sentence. *See id.* at 212–13; *Rodriguez*, 794 P.2d at 969–70.

As to the defendant's character and record, several factors distinguish this case to some extent from those in which we have upheld the propriety of a death sentence. *See, e.g., Dunlap,* 975 P.2d at 764–65. On several occasions, including while exercising his right of allocution at trial, the defendant has expressed remorse and compassion for his victims and their families. The defendant did not have an extensive prior criminal record and sentencing phase evidence suggested he would not pose a significant threat of violence to others if sentenced to life imprisonment. Despite these positive features of the defendant's character and record, our independent consideration of the relevant features of the record establishes that, in light of the exceptionally brutal nature of the events leading to Maloney's murder, the death sentence is appropriate.

 Looking now to the public interest affected by the imposition of a death sentence in this case, it is not our role to concern ourselves with the morality of the death penalty or whether the execution of a human being contributes to the welfare of society. See *id.* at 765. Rather, we consider whether overwhelming evidence establishes that "the person facing the death penalty [is] the perpetrator of the crime and that the trial and sentencing proceeding [was] fundamentally fair." *See id.* Moreover, we will not permit a death sentence in a case where there is a close issue concerning the identity of the murderer or in a case where new evidence someday could reveal that the wrong person has been convicted. *Id.* Here, the defendant admitted killing Maloney; there is, in addition, no reason to question his identity as her murderer. Moreover, overwhelming evidence was presented at trial to clearly establish Harlan's guilt for the first degree murder of Maloney.

As for the fundamental fairness of the trial and sentencing proceeding, we have expressed reservations about the fairness of certain aspects of these proceedings. *See supra* Part II.A; *see also infra* Part V.B. Nevertheless, we determined that none of these concerns individually warrants reversal of the death sentence. Viewing the trial as a whole, under the separate and additional review mandated by section 16–11–103(6)(a), we find no further grounds upon which to conclude that the defendant suffered a fundamentally unfair trial.

Therefore, our independent review, under section 16–11–103(6)(a), of the factual circumstances of this case, leads us to affirm the jury's finding that a death sentence is an appropriate punishment for Harlan's first degree murder of Maloney.

### B. Arbitrariness

 Section 16–11–103(6)(b) states that the defendant's death sentence may not be imposed if we determine that "the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor or that the evidence presented does not support the findings of statutory aggravating factors." Because we have already determined that the prosecution proved three statutory aggravating factors, we concern ourselves here only with whether the death sentence was imposed under the influence of any arbitrary factor. In this regard, we are troubled by several racial dimensions of this case and are concerned that racial bias may have been a factor in the imposition of a death sentence. Our review of the record as a whole, however, supports the finding that racial prejudice did not undermine the fundamental fairness of the defendant's trial.

Racial prejudice is the "paradigmatic capricious and irrational sentencing factor." *Graham v. Collins,* 506 U.S. 461, 484, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) (Thomas, J., concurring); *see also Turner,* 476 U.S. at 43, 106 S.Ct. 1683 (Brennan, J., concurring in part and dissenting in part) ("To sentence an individual to death on the basis of a proceeding tainted by racial bias would violate the most basic values of our criminal justice system."). Several dimensions of this case create a risk of racial prejudice undermining the fairness and reliability of the defendant's death sentence. Harlan is an African–American male convicted of the brutal kidnapping, and murder of a Caucasian female. This fact alone causes us to examine carefully whether racial bias distorted the jury's sentencing phase decision-making process. *See Turner,* 476 U.S. at 36 n. 8, 106 S.Ct. 1683 ("[I]t is

plain that there is a risk of racial prejudice influencing a jury whenever there is a crime involving interracial violence."). Moreover, several Caucasian women testified for the prosecution during the sentencing phase concerning the defendant's prior sexual misconduct.[54] Such testimony may have echoed a subconscious and pernicious racist image of African–American males as sexual predators preying on Caucasian women. Finally, there were no African–American persons on the jury. *Cf. id.* at 31, 106 S.Ct. 1683 (stating that racial prejudice may impermissibly affect even racially diverse capital juries).

■■ We are particularly concerned that evidence of the defendant's prior sexual misconduct, although admissible under CRE 401–403,[55] may have distorted the jury's consideration of other sentencing phase evidence and its ultimate decision to impose the death sentence. To conduct the review required by section 16–11–103(6)(b), we ask whether, viewing the case as a whole, racial prejudice undermined the fairness of the proceedings. We determine for several reasons that it did not.

Many features of the trial process ameliorated the potential racial bias of the sexual misconduct testimony and other risks of prejudicial influence. The trial court took precautions at the outset of the trial to foreclose the injection of improper racial considerations by including questions concerning racial issues in the jury questionnaire. Counsel were also allowed to question jurors in detail concerning their racial views. Prior to the sentencing phase, the trial court instructed the jury that it "must not consider the race, gender or personal appearance of Robert Harlan as any sort of reason in favor of a death sentence." *See* Sentencing Phase Instruction No. 23. The trial court also removed a juror from the venirepool due to the juror's bias against African–Americans. *See infra* Appendix Part A.1.

In addition, the prosecution during voir dire emphasized that the defendant should not be convicted on the basis of his race. At no time did the prosecution rely on innuendo, stereotypical attitude, overt or subtle racial argument, misuse of the penalty phase testimony, or any other kind of appeal to racial prejudice. This case, therefore, is distinguishable from those in which improper prosecutorial use of racially tinged evidence mandates reversal of the death sentence. *See, e.g., Robinson v. State,* 520 So.2d 1, 7 (Fla. 1988); *People v. Richardson,* 49 Ill.App.3d 170, 7 Ill.Dec. 3, 363 N.E.2d 924, 926–27

---

**54.** Colleen Harlan testified that the defendant claimed on one occasion that he "drove around at night ... looking for women walking alone so that he could think of ways to rape and kill them and get away with it." Tracie Schoenberger, a co-worker of the defendant, testified that he sexually harassed her. Terrilynn Carlson testified that Harlan attempted twice to sexually assault her. Laura Jennings stated that, during a sexual assault, Harlan told her repeatedly that she would fall in love with his "big black dick" and that she would commit sexual acts for him that his wife would not. Jennings also testified that Harlan urged her to come inside the house where he eventually assaulted her because, in his words, a white woman wearing "dressy going-out clothes" should not sit alone in a car parked in a "black neighborhood." This evidence further emphasized the racial dimensions of the case.

**55.** *See supra* Part IV.C.1. Our review of evidence admitted under CRE 401–403 and our review of the propriety of a death sentence under section 16–11–103(6)(b) are distinct, though possibly related, enterprises. When reviewing under CRE 401–403 the introduction of the sentencing phase evidence of Harlan's prior sexual misconduct, our task is only to determine whether the trial court abused its discretion in finding that the admitted evidence's unfair prejudicial effect did not substantially outweigh its probative value. This is a very deferential standard of review. *See Gibbens,* 905 P.2d at 607.

In contrast, under section 16–11–103(6)(b) we are obligated to conduct a broad-ranging inquiry into whether constitutionally impermissible factors influenced the jury's decision to impose the death penalty. We may take into account trial-level evidentiary rulings as part of that examination, but our determination that a trial court's evidentiary rulings satisfy the deferential *Gibbens* standard does not substitute for our analysis under section 16–11–103(6)(b). Even if we decide that the trial court properly *admitted* the sexual misconduct evidence, it is still possible to question whether such evidence improperly caused the jury to impose a death sentence under the influence of racial prejudice. Otherwise, our dual function in capital cases as "an appellate court reviewing trial court proceedings" and as "independent arbiters to review the propriety of the [death] sentence" is lost. *Dunlap,* 975 P.2d at 765.

(1977); *Dawson v. State,* 103 Nev. 76, 734 P.2d 221, 223–24 (1987).

Finally, the defendant raped, kidnapped, assaulted, and killed his victim in an especially brutal way. These facts, standing apart from the racial dimensions of the case, substantially parallel prior cases in which we have found a death sentence to be appropriate. *See, e.g., Rodriguez,* 794 P.2d at 969–70; *Davis,* 794 P.2d at 167–69. Thus, we are satisfied that racial prejudice did not undermine the fundamental fairness of the defendant's conviction or sentence. Accordingly, we uphold under section 16–11–103(6)(b) Harlan's death sentence.

## VI. DIRECTIONS ON REMAND

We affirm the judgment of conviction and sentence of death imposed on Harlan, while vacating the sentence imposed for the attempted murder of Maloney. Furthermore, we remand this case to the trial court for imposition of the death sentence and for further proceedings consistent with this opinion.

Justice BENDER does not participate.

### APPENDIX ***

### A. Jury Selection and Venue

1. **Whether the trial court erroneously excused qualified jurors at the prosecution's request.**

After reviewing the voir dire of prospective jurors that the trial court excused for cause, we conclude that the trial court did not abuse its discretion in excusing these jurors: (1) Brook Massanet was disqualified because she did not reside in Adams County on the date that jury service was to be performed, *see* § 13–71–105(2)(e), 5 C.R.S. (1999); (2) Lillian Lasley because of hardship not related to her financial situation; (3) Antonio Ruybal, Pamela Darula, and John Lusk because their views on capital punishment substantially impaired the performance of their duties as jurors in accordance with their instructions and their oath, *see Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841

(1985); and (4) Pedro Ulibarri because of his bias against African–Americans.

2. **Whether the trial court improperly allowed the prosecution to exercise peremptory challenges on the basis of gender and religious affiliation.**

Harlan claims that the prosecution's use of peremptory challenges against prospective jurors Linda Garcia, Jacqueline Flores, Sandra Liggett, and Dorothy Schwann were improperly based on their gender. *See Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also J.E.B. v. Alabama,* 511 U.S. 127, 142–43, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). We conclude that Harlan did not sustain his burden of showing purposeful discrimination under the third *Batson* step. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

Harlan also alleges that the prosecution exercised improper peremptory challenges to Garcia, Flores, and George Fortin because they were Roman Catholics. The exercise of peremptory challenges based on a prospective juror's religion is prohibited by section 13–71–104(3)(a), 5 C.R.S. (1999). We conclude that Harlan did not satisfy his burden of proving that the prosecution's strikes were exercised in a discriminatory manner based on religion.

3. **Whether the trial court improperly excluded jurors on the ground that they could not read, write, or understand English.**

Harlan objected to the exclusion of jurors based on their race, national origin, and lower economic status. We conclude that Van Vu, Cruz Carillo, and Dorothy Velasquez were properly excluded because of their inability to read, speak, and understand English. *See* § 13–71–105(2).

4. **Whether the prosecution and the trial court misled the jurors during voir dire about the affirmative defense of voluntary intoxication.**

Harlan claims that prospective jurors were misled about the prosecution's burden of

---

*** As we stated in the opinion, we do not discuss the issues in this appendix in sufficient detail to give guidance in future cases. Thus, the appendix is not to be cited or relied upon as authority.

proof with respect to voluntary intoxication as an affirmative defense. As explained in the body of the opinion, voluntary intoxication is not an affirmative defense to a specific intent crime. *See supra* Opinion Part III.A. Rather, a defendant is allowed to introduce evidence of voluntary intoxication to negate the existence of the requisite specific intent of the charged offense. *See* § 18–1–804(1), 6 C.R.S. (1999). However, the purpose of voir dire is not to instruct prospective jurors on the law, but to determine whether they could conscientiously apply the law given by the court in its instructions. *See People v. Davis,* 794 P.2d 159, 207 (Colo.1990). Accordingly, any error the trial court may have committed in its rulings regarding voluntary intoxication during the jury selection phase is harmless beyond a reasonable doubt.

### B. Guilt Phase Issues

1. **Whether the trial court erred in granting the prosecution's motion in limine to preclude evidence that Jaquie Creazzo anatomically was a man at the time of the incident, and also erred in ruling that the door to Creazzo's gender had not been opened during her testimony.**

The night that Creazzo attempted to rescue Maloney, Creazzo, at that time anatomically a man, was dressed as a woman. Creazzo completed a sex-change operation shortly before the trial. The trial court did not err when it granted the prosecution's motion that all parties refer to Creazzo as a woman and take steps to avoid eliciting testimony to the contrary. The marginal probative value of Creazzo's sex when Harlan shot her was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury" and was properly excluded. CRE 403.

Second, when Creazzo testified that she thought about her children after she had been shot, she did not open the door for Harlan to introduce evidence that she had once been a man. We reject the premise implicit in Harlan's complaint—that only a woman would think about her children when seriously injured.

2. **Whether the trial court erred in refusing to grant a mistrial because the prosecutor played to the jury's sympathy during Jaquie Creazzo's testimony.**

The trial court was satisfied that the prosecutor's solicitude for Creazzo did not disrupt the flow of the testimony or unduly prejudice the jury's consideration of the case. We conclude that the trial court did not abuse its discretion in denying Harlan's motion for a mistrial.

3. **Whether the trial court erred in admitting autopsy photographs of Rhonda Maloney and in admitting a large diagram of the female perineum.**

The trial court did not abuse its discretion when it found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* CRE 403; *see also People v. Lowe,* 184 Colo. 182, 189–90, 519 P.2d 344, 348 (1974).

4. **Whether the trial court erred in admitting evidence of post-mortem injuries on Maloney's body.**

This evidence did not become irrelevant because Harlan did not dispute the prosecution's contentions that Maloney's body was found under a bridge or regarding how long it rested there. *See Kostal v. People,* 160 Colo. 64, 77, 414 P.2d 123, 130 (1966). Sentencing Phase Instruction No. 10 specifically prohibited the jury from considering events occurring after Maloney's death to prove any of the aggravating circumstances in the sentencing phase. *Cf. People v. White,* 870 P.2d 424, 447 (Colo.1994).

5. **Whether the trial court erred in refusing to impose sanctions or to disqualify the prosecutor's office.**

In ruling on Harlan's motions to impose sanctions and disqualify the district attorney's office because of misrepresentations, the trial judge stated that, based on the defendant's allegations, he could not find that the district attorney had made misrepresentations, and even if they had occurred, Har-

lan had not demonstrated any prejudice as a result. The trial court's findings are supported by the record, and we decline to overturn them.

**6. Whether the trial court erred in instructing the jury that Harlan was charged with two separate and distinct crimes of first degree murder.**

In *People v. Lowe*, 660 P.2d 1261, 1269 (Colo.1983), we held that first degree murder after deliberation and first-degree felony murder were not separate offenses, but were alternative ways of committing first degree murder. Any error in the failure to instruct the jury in the guilt phase of the trial that Harlan was charged with only one first degree murder was harmless beyond a reasonable doubt. Sentencing Phase Instruction No. 4 informed the jury that the convictions for first degree murder after deliberation and first degree felony murder merged for sentencing purposes.

**7. Whether the trial court failed to instruct the jurors on the mental state elements of the two attempted murder charges.**

Harlan contends that he submitted instructions, which were refused, that would have informed the jury that in order to find him guilty of the attempted murder of Maloney and the attempted murder of Creazzo, they had to find that he intended to cause the death of Maloney and Creazzo, respectively, and that he acted after deliberation. Each attempted murder instruction, Guilt Phase Instruction Nos. 9 and 11, refers to Guilt Phase Instruction No. 13, which contains the elements for first degree murder after deliberation. We conclude that there was no reasonable likelihood that the jury would not have understood that they were required to find that Harlan intended to cause the deaths of Creazzo and Maloney.

**8. Whether the trial court's instructions on the "sexual assault" and "use of a deadly weapon" aspects of second degree kidnapping were proper.**

Sexual assault kidnapping and deadly weapon kidnapping are not mutually exclu-

sive. The phrase "use of a deadly weapon but did not include sexual assault or robbery" means that a second degree kidnapping that involves sexual assault is still a class 2 felony, and is not reduced to a class 3 felony, when the defendant uses a deadly weapon. *See* § 18–3–302(4), 6 C.R.S. (1999). The court's refusal to instruct the jury that robbery or sexual assault and use of a deadly weapon were elements of second degree kidnapping is consistent with *People v. Henderson*, 810 P.2d 1058, 1062 (Colo.1991).

**9. Whether the trial court's jury instructions on the sentence enhancement factors for second degree kidnapping were proper.**

Harlan had adequate notice before trial of the elements of the robbery, sexual assault, and deadly weapon sentence enhancement factors for second degree kidnapping. The information and pretrial discovery provided Harlan notice of the facts upon which the prosecution would rely at trial. Moreover, although he was not charged with robbery or sexual assault as separate offenses, the jury was instructed as to the elements of both robbery and first degree sexual assault.

**10. Whether the trial court's defense theory of the case instruction to the attempted murder and assault charges was error.**

Although the court's theory of the case instruction omitted intoxication as a defense to the attempted murder counts and first degree assault count, Guilt Phase Instruction No. 28 informed the jury that the defense of intoxication applied to the attempted murder and first degree assault counts. Thus, there was no prejudicial error.

**11. Whether it was error for the trial court to instruct the jurors that the possible punishment should not enter into their consideration, and to refuse the alternative instruction the defense tendered.**

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), a Texas statute, that required a prospective juror to be disqualified unless the juror stated under oath

that the mandatory penalty of death or life imprisonment "will not affect his deliberations on any issue of fact," was found to violate the Sixth and Fourteenth Amendments. The statute could be read to exclude jurors who might be "affected" by the possible death penalty in that the possible punishment would invest their deliberations with greater seriousness. *See id.* at 49–50, 100 S.Ct. 2521. *Adams* did not prohibit a jury instruction that the possibility of a death sentence should not enter into their consideration at the guilt-innocence phase. The trial court did not err.

**12. Whether the trial court erred in failing to answer the jury's question about the requisite intent for the offense of attempted first degree murder of Jaquie Creazzo.**

The jury's first note to the judge requested clarification of the jury instruction on the attempted murder of Creazzo: "Should this have read intended to cause the death of Jackie Creazzo. Could you please clarify for us." Before the judge could inform the parties of his intended response, the jury sent out a second note that they had "figured it out," so no response was given to the jury. The wording of the first note indicated that the jury adequately understood the instruction, so there was no error in not answering the jury's question after it was withdrawn. *Cf. Weeks v. Angelone,* 528 U.S. 225, ——, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000).

**13. Whether the conviction for the attempted murder of Jaquie Creazzo was based on a substantive amendment to the information.**

Reading the attempted murder of Creazzo instruction, Guilt Phase Instruction No. 9, together with Guilt Phase Instruction No. 13, there was no reasonable likelihood that the jury would not have understood that they were required to find that Harlan intended to cause the death of Jaquie Creazzo in order to convict him of the attempted murder of Creazzo. Because this was precisely what the information charged, there was no substantive amendment.

**14. Whether the two convictions for attempted murder are supported by identical elements.**

The elements were not identical. One conviction required the intent to cause the death of Jaquie Creazzo; the other required the intent to cause the death of Rhonda Maloney.

**15. Whether Harlan's conviction for second degree kidnapping must be vacated because it is based on an inadequate information and the trial court erred in denying the defendant's motion for a bill of particulars.**

Although phrased differently, this issue is identical to one the defendant raises above. *See supra* Appendix Part B.9. The information and pretrial discovery provided Harlan notice of the facts upon which the prosecution would rely at trial. The jury was properly instructed as to the elements of both robbery and first degree sexual assault.

**16. Whether the prosecutor committed misconduct during the guilt phase of the trial.**

After reviewing the record of the guilt phase of Harlan's trial, we conclude: (1) the prosecutor did not refer to victim-impact evidence during opening argument, and the trial court's instruction to the jury to disregard the prosecutor's use of his fingers to represent quotation marks cured any prejudice to the defendant; (2) the prosecutor did not elicit improper character evidence from Creazzo, because her testimony regarding Harlan's actions and intent was based on her own personal observations and what Maloney told her and thus was proper; (3) the trial court instructed the jury to disregard the prosecutor's statement about not having been given a transcript of a witness's statement to the defense, so no error is shown; (4) the trial court correctly found that the victim's mother's reference to sewing up the slit on the victim's skirt was inadvertent and not a product of prosecutorial misconduct; (5) any potential prejudice raised by the prosecutor's reference to petty theft allegations against a defense witness was cured when the trial court instructed the jury to disregard any testimony about a misdemeanor offense and

not consider it for any purpose whatsoever; and (6) the prosecution's closing argument was based on the evidence and reasonable inferences from the evidence: the argument did not contain the improper personal opinions of the prosecutor; it did not misstate the law or the facts in a prejudicial way; and the trial court correctly denied Harlan's motion for a mistrial.

## 17. Whether the trial court allowed improper sympathy evidence to be admitted.

Harlan complains about a photograph of Maloney taken while she was alive, police testimony that Maloney's husband was extremely upset when he was told that his wife was missing, and testimony as to the condition of Maloney's body when it was found. Maloney's photograph was used by witnesses to identify her; the fact that the victim's husband was distraught was natural and foreseeable and could not have prejudiced the defendant; and we have already held that there was no error in admitting evidence of the circumstances under which Maloney's body was found, how long the body had been under the bridge, and the existence of postmortem injuries. *See supra* Appendix Part B.4. A defendant may not preclude the prosecution from presenting evidence of a fact by conceding the existence of the fact. *See Kostal,* 160 Colo. at 77, 414 P.2d at 130.

## 18. Whether the trial court prevented the defendant from presenting evidence and pursuing legitimate lines of inquiry.

Our review of the record and applicable law convinces us that: (1) district courts in Colorado do not have the inherent authority to grant immunity without the acquiescence of the prosecution, *see* § 13–90–118(2), 5 C.R.S. (1999); *Harding v. People,* 708 P.2d 1354, 1358 (Colo.1985), so there was no error in refusing to grant immunity to Dino Grant; (2) the defense investigator's testimony was either irrelevant or so marginally relevant to any issue in the case that it was excludable under CRE 403; and (3) Harlan's statements were hearsay and not admissible as the admission of a party opponent under CRE 801(d)(2), or as statements against interest under CRE 804(b)(3).

## 19. Whether the trial court should have polled the jury about three incidents occurring during the trial.

We determine that: (1) a newspaper article about a death penalty case that was not connected with Harlan's trial, and was not prejudicial to Harlan, did not require the trial court to canvass the jury or to question jurors individually to see if they had learned of the publicity, *see Harper v. People,* 817 P.2d 77, 83–84 (Colo.1991); (2) the trial court took appropriate steps to prevent a disruptive spectator's behavior from having a prejudicial effect on the jury, so a poll of the jury would have been superfluous; and (3) it was not disputed that the jurors' possible exposure to Harlan in handcuffs was inadvertent; thus, it was not necessary to poll the jury or to grant a mistrial, *see People v. Dillon,* 655 P.2d 841, 846 (Colo.1982); *McLean v. People,* 172 Colo. 338, 347, 473 P.2d 715, 719–20 (1970).

## 20. Whether the trial court erred in admitting a lay witness's opinion.

The trial court properly overruled Harlan's objection to a police officer's observation that the area where Maloney's car first pulled off the road looked "[l]ike somebody got there and got stuck." On cross-examination, the witness clarified that there was nothing to indicate that Maloney's car was stuck.

## 21. Whether the trial court erred in allowing the officers who interrogated the defendant following his arrest to testify about their interview techniques.

The jury watched a videotape of Harlan's interrogation. When the interrogation took place, Maloney's body had not been found and her fate was uncertain. The trial court allowed the officers who conducted the interrogation to explain that they made certain statements without believing them to be true, or without knowing whether the statements were accurate. Without such an explanation, there was a danger that the jury would be

left with the false impression that the officers had information supporting the defense that had not been disclosed or revealed.

## C. Sentencing Phase Issues

### 1. Whether the prosecution should have been allowed to make rebuttal closing argument.

After reviewing the legislative history and relevant amendments to section 16–11–103, 6 C.R.S. (1999), we conclude that by repealing and re-enacting section 16–11–103, the General Assembly did not intend to modify the right to rebuttal closing argument. *See* ch. 4, sec. 1, § 16–11–103(1)(b), 1991 Colo. Sess. Laws, 2d Extraordinary Sess. 8, 9. Absent a compelling reason to the contrary, the prosecution has the last word in a capital sentencing proceeding because it bears the ultimate burden of persuasion. *See Clermont v. State,* 348 Md. 419, 704 A.2d 880, 893 (1998). The trial court did not err in allowing the prosecution to have rebuttal argument.

### 2. Whether the trial court was required to strike the prosecution's sentencing phase witnesses.

Harlan asserts that the court should have excluded Jami Taylor, Tracie Schoenberger, Laura Jennings, Terrilynn Carlson, and Colleen Harlan as witnesses for the prosecution in the sentencing phase. However, the record shows that Harlan did receive notice with respect to these five witnesses before the discovery deadline.

### 3. Whether the prosecutor suggested that the defendant had previously raped and killed.

On cross-examination of Dr. Radelet, Harlan's sentencing phase expert witness, the prosecutor asked about Colleen Harlan's testimony that Harlan told her he drove around looking for women, and thought about ways of raping and killing them. The prosecutor then asked, "That's suggestive of an inclination towards *prior* crime, towards *additional* violent crime, isn't it?" (Emphasis added.) Harlan did not object when the question was asked, but moved for a mistrial after Dr.

Radelet's testimony concluded. The trial court acted within its discretion in denying Harlan's motion for a mistrial because the prosecutor's reference to "prior crime" was a misstatement that the prosecutor caught and corrected.

### 4. Whether the court should have granted the defendant's motion for a mistrial after the court struck Jami Taylor's testimony.

Jami Taylor, one of the prosecution's witnesses, testified that, while he was attempting to sexually assault her, Harlan told her that "he wanted to screw me in my ass." The trial court found a discovery violation, struck all of Taylor's testimony, and instructed the jury to disregard her testimony. Jurors are presumed to have followed the court's instructions. *See People v. Dunlap,* 975 P.2d 723, 743 (Colo.1999). Thus, the sanction selected and the denial of a mistrial were within the trial court's discretion.

### 5. Whether the trial court excluded substantial mitigation evidence.

In addition to the testimony of Dr. Suzanne Bernhard and therapists Walt Simon and Roger Lyons, *see supra* Part IV.A., Harlan asserts that the trial court erred in excluding additional evidence he deems mitigating. We find: (1) because Harlan declined to introduce the transcript of his sentencing for misdemeanor sexual assault in 1992, there was no error; (2) a witness's opinion of whether or not the car's line of travel in the 1984 accident involving Robert and Colleen Harlan would have made the car hit the rail "full on or graze off," was properly excluded because it called for speculation; (3) exclusion of LaWanda Davis's testimony about a statement Colleen Harlan made to her five years before the trial was harmless beyond a reasonable doubt given: the lapse of time between the statement and the time of trial; the fact that the jury knew Harlan and his ex-wife were divorced at the time of trial; and that the evidence at the sentencing hearing was overwhelmingly against Harlan; and (4) evidence regarding the deterrent effect of the death penalty, its disproportionality in this case by reference to other cases, public

opinion, and the costs of execution was properly excluded because it was not relevant to the issues the jury considers in the sentencing phase, and was outside the scope of constitutionally required mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *People v. Tenneson*, 788 P.2d 786, 799 (Colo.1990).

### 6. Whether the trial court abused its discretion in not allowing Harlan to put on surrebuttal evidence.

Harlan's expert testified about various Colorado prison facilities, stressing the strict regimen of a maximum-security facility. In rebuttal, the prosecution's witness testified that Harlan could be placed in a medium security facility where he would have more privileges and could more freely interact with inmates and prison employees. The trial court refused to allow Harlan to present surrebuttal mitigation evidence following this rebuttal evidence. Because the prosecution's evidence only served to rebut Harlan's mitigating evidence, and did not introduce any new matter, whether to permit surrebuttal evidence was within the court's discretion. *See People v. Brockman*, 699 P.2d 1339, 1342 (Colo.1985).

### 7. Whether the trial court's *Curtis* advisement at the sentencing hearing was adequate.

We have never extended the requirement of a *Curtis* advisement to the sentencing phase of a death penalty case and we do not reach that question here. Harlan received a *Curtis* advisement during the guilt phase of the trial, and again during the sentencing phase, but argues that he should have been advised that the felonies for which this jury found him guilty could not be used to impeach him. The jury's finding of the defendant's guilt may be used to assess the defendant's credibility as a witness during the sentencing phase of the trial because it relates to the defendant's possible motive for testifying. *See* Sentencing Phase Instruction No. 28 (quoting COLJI–Crim. 3:06).

### 8. Whether the trial court's refusal to instruct the jury not to consider various factors as reasons to impose the death penalty was error.

Harlan next argues that the court should have instructed the jury that it could not consider the cost of incarceration, deterrence and vengeance, or his economic status as reasons to impose the death penalty. The prosecution did not argue that any of these factors were reasons to impose the death penalty. Moreover, Sentencing Phase Instruction No. 14 suitably channeled the jurors' discretion in what they could consider in their deliberations by stating that, "[T]he law requires that your decisions not be the result of passion, prejudice, or any other irrational or arbitrary emotional response against Robert Harlan." Accordingly, we find no error.

### 9. Whether the submission of "straw men" mitigating factors was error.

Harlan contends that the trial court erred when it submitted certain statutory mitigating factors for the jury to consider over defense counsels' objection. The court instructed the jury on the following statutory mitigating factors:

1. The age of the defendant at the time of the crime.

2. The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

3. The defendant was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution.

4. The defendant could not reasonably have foreseen that the defendant's conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person.

5. The emotional state of the defendant at the time the crime was committed.

6. The absence of any significant prior conviction.

7. The extent of the defendant's cooperation with law enforcement officers or agencies and with the office of the prosecuting attorney.

8. The influence of drugs or alcohol.

9. The defendant is not a continuing threat to society.

10. Any other evidence which bears on the question of mitigation.

*You may not in any fashion consider any of these types of factors as aggravation or reasons in favor of a death sentence.*

Sentencing Phase Instruction No. 12 (emphasis added). These mitigating factors tracked the factors listed in section 16–11–103(4)(a)–(*l*) with two omissions: (4)(d) (the defendant was only a minor participant in an offense committed by another); and (4)(j) (good faith, but mistaken, belief that the defendant's conduct was morally justified).

The defendant complains that he did not want four of these statutory mitigating factors to be submitted to the jury that were not raised by the evidence. According to Harlan, their submission served only to distract the jurors from the actual mitigating factors in the case, bias the jury against him for raising non-existent mitigation, and allow the prosecution to argue the factors did not exist.

In particular, Harlan objects to the introduction of the significant impairment (no. 2), duress (no. 3), unforeseeability (no. 4), and cooperation with law enforcement (no. 7) mitigating factors. Even assuming for the sake of argument that these four mitigating circumstances were not raised by the evidence, their submission to the jury was, at most, harmless error. First, these four factors were only a small number of the 107 mitigating factors that Harlan submitted to the jury. Second, and more importantly, Sentencing Phase Instruction No. 12 instructed the jurors that: "You may not in any fashion consider any of these types of factors as aggravation or reasons in favor of a death sentence." In the absence of evidence to the contrary, we will presume that the jury understood and heeded the court's instructions. *See Dunlap,* 975 P.2d at 743.

10. **Whether the trial court erred in rejecting Harlan's tendered instruction that the jurors should not base their decisions at the sentencing hearing on speculation, suspicions, or the arguments of counsel.**

First, although the trial court rejected the specific language Harlan requested, other jury instructions properly directed the jurors' consideration of evidence. Second, in reaching their decision for or against a death sentence, the jury was quite properly allowed to consider the arguments of counsel, based on the evidence. *See* § 16–11–103(1)(b).

11. **Whether the trial court erred in not giving Harlan's "conscience of the community" instruction.**

During closing argument, the prosecution told the jury three times that it sat as the "conscience of the community." Harlan's objection was overruled. The court also refused his request to instruct the jury that while it sat as the "conscience of the community," jurors were *not* permitted to consider that anyone else in the community might believe that death was the appropriate punishment.

It is not error for a prosecutor to refer to the jurors as the "conscience of the community." *See People v. Rodriguez,* 794 P.2d 965, 977 (Colo.1990); *Davis,* 794 P.2d at 200. In addition, the phrase was used in the prosecution's closing argument; it was not a phrase from the jury instructions that might require further definition. Harlan was free to argue his definition of the phrase in his own closing argument.

12. **Whether the trial court erred in not instructing the jurors that they should not be influenced by sympathy for the victim in the sentencing phase.**

There was no error in refusing to give such an instruction. *See Rodriguez,* 794 P.2d at 988. Sentencing Phase Instruction No. 26 prohibited the jury from making any deci-

sions based on "passion, prejudice, or any other irrational or arbitrary emotional response." This instruction prevented the jury from basing its decision on improper factors.

**13. Whether the trial court instructed the jury that the defendant was convicted of two separate and distinct crimes of first degree murder.**

The jury was instructed "that you are not sentencing Robert Harlan for any other charges of which he has been convicted in this case *except the conviction of first degree murder (after deliberation )*." Sentencing Phase Instruction No. 3 (emphasis added). Sentencing Phase Instruction No. 4 told the jury that, for purposes of sentencing, Harlan's convictions for first degree murder after deliberation and first degree felony murder merged. Thus, the jury was not instructed that Harlan was being sentenced for more than one count of murder.

**14. Whether the subsection (5)(g) aggravating factor is invalid because it exists in virtually every first degree murder case.**

The defendant contends that subsection (5)(g) fails to present a principled basis for distinguishing a case in which a death sentence may be imposed from those in which a death sentence is unwarranted. According to the defendant, because every first degree murder after deliberation is intentional and a class 1 felony, subsection (5)(g) automatically makes all cases of first degree murder after deliberation death-eligible offenses. We disagree.

The plain meaning of subsection (5)(g) indicates that the predicate felonies underlying the aggravator must be distinct from the murder itself. Subsection (5)(g) requires the commission of a class 1, 2, or 3 felony *in addition* to the intentional killing of the murder victim. Therefore, subsection (5)(g) facially limits the sentencing body's discretion and rationally distinguishes between those individuals for whom death is an appropriate sanction and those for whom it is not. *See Blystone v. Pennsylvania,* 494 U.S. 299, 306–

07, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *White,* 870 P.2d at 446.

Moreover, the prosecution in this case did not allege that the murder of Maloney itself formed the factual predicate of subsection (5)(g). The prosecution's theory was that the killing occurred in connection with any of three class 2 felonies—the attempted murders of Creazzo and Maloney and the second degree kidnapping of Maloney. The jury was required to find that at least one of these class 2 felonies formed the factual predicate of subsection (5)(g) before it could conclude that the prosecution had proved the aggravating factor beyond a reasonable doubt. We can detect no reasonable basis in the record for concluding that the jury may have relied on the murder of Maloney as the basis for its finding of subsection (5)(g).

**15. Whether the subsection (5)(g) aggravating factor is invalid because it was based on the conviction for second degree kidnapping.**

Harlan's next argument is that the second degree kidnapping of Maloney charge is an impermissible basis for subsection (5)(g) because the conviction was improperly obtained. We have already rejected this argument. *See supra* Opinion Part III.C. Therefore, the jury could properly base its finding of subsection (5)(g) on the second degree kidnapping conviction. The defendant also claims that, because the second degree kidnapping charge formed the factual predicate for the felony murder conviction, the jury necessarily also found the subsection (5)(g) aggravator when it convicted Harlan of felony murder. Thus, the defendant's argument proceeds, subsection (5)(g) failed to present a principled reason for imposition of the death sentence. This argument fails because Harlan was not sentenced to death for the felony murder conviction. The defendant's convictions for first degree murder after deliberation and felony murder merged for the purposes of sentencing. The felony murder conviction, therefore, was not taken into account by the jury when deciding what sentence to impose on the defendant. The jury sentenced Harlan to death for the first degree murder after deliberation conviction, which does not

require the commission of an underlying felony, as does felony murder. Thus, the jury did not automatically find subsection (5)(g) when it convicted Harlan of first degree murder after deliberation.

### 16. Whether the jury was properly instructed on the legal and factual elements of the subsection (5)(g) aggravating factor.

Harlan also argues that the jury was not properly instructed as to the legal and factual elements of subsection (5)(g). Harlan alleges that this error lowered the prosecution's burden of proof in violation of the Due Process and Cruel and Unusual Punishment Clauses of the federal and state constitutions and section 16–11–103(1)(d). He also claims that the trial court's refusal to require the prosecution to provide formal notice of the felonies underlying subsection (5)(g) deprived him of the opportunity to present a defense. We disagree with both contentions.

The trial court properly instructed the jury as to the legal elements of subsection (5)(g). *See* Sentencing Phase Instruction No. 6. The prosecution thus was kept to its burden to prove all elements of subsection (5)(g) beyond a reasonable doubt. We assume, absent evidence to the contrary, that the jury followed this instruction when it found the aggravating factor. *See Dunlap,* 975 P.2d at 743.

Moreover, the defendant was provided with sufficient notice of the factual elements alleged by the prosecution to underlie subsection (5)(g). All of the evidence offered in support of the predicate felonies for subsection (5)(g) was presented at the guilt phase of the trial. The verdict form for step one of the sentencing process set forth the predicate felonies the prosecution relied upon for the aggravator. We conclude that the defendant had a fair opportunity to rebut the prosecution's sentencing phase arguments. We will not require a trial court to instruct the jury as to the factual elements underlying an aggravating factor unless there is a reasonable likelihood that the jury may construe the predicate factual elements in a manner that renders the aggravating factor

unconstitutional in some sense. We find no such possibility regarding subsection (5)(g).

### 17. Whether the trial court's definition of "intentional" at the sentencing hearing was error.

The trial court's definition of "intentional" is taken almost verbatim from section 18–1–501(5), 6 C.R.S. (1999). Sentencing Phase Instruction No. 9 provided that "for the purpose of [the instruction listing statutory aggravating factors], that: A person acts 'intentionally' or with 'intent' when his conscious objective is to cause the specific result *proscribed by the statute defining the offense.* It is immaterial whether or not the result actually occurred." (Emphasis added.)

Harlan has two objections. First, the definition of "intentionally" in the sentencing instructions referred to statutory aggravating factors, not *offenses.* Given the context of the definition and its specific reference to the aggravators, however, we conclude that there was no likelihood that the jury was misled or confused. *See Davis,* 794 P.2d at 192–93.

Second, Harlan asserts it was error to instruct the jury that whether the result occurs is irrelevant to whether intent exists. Harlan argues that this definition of "intent" directed the jurors to ignore relevant evidence in the sentencing phase of his trial. We disagree. Whether or not the result Harlan intended actually occurred was addressed by the other elements of the instructions defining the statutory aggravators.

### 18. Whether the trial court's instruction that "judicially noticed facts" were true as a matter of law was proper.

The trial court took judicial notice of "the fact that first-degree murder after deliberation is a Class 1 felony, that attempted first-degree murder is a Class 2 felony, that second-degree kidnapping is a Class 2 felony as pertains to this case." Sentencing Phase Instruction No. 7. Sentencing Phase Instruction No. 33 stated that "[a] judicially noticed fact is one which the Court determines is not subject to reasonable dispute and which the Court has accepted as being true." The classification of a criminal offense is a ques-

tion of law, not of fact. *See Massey v. People*, 649 P.2d 1070, 1073 (Colo.1982). It was not error for the trial court to take judicial notice of the classifications of the felony offenses relevant to the aggravating factors.

19. **Whether the death sentence was improperly based on duplicative aggravating factors.**

Harlan contends that the jury's decision to impose the death penalty was improperly based largely on two statutory aggravating factors—subsection (5)(d) (kidnapping) and subsection (5)(g) (felony murder with kidnapping as a predicate felony)—that were duplicative and overlapped each other. Because second degree kidnapping was one of the predicate felonies for the (5)(g) aggravating factor, as well as a basis for the (5)(d) aggravating factor, Harlan argues that these two aggravating factors were so similar that their use by the jury in their deliberations unfairly skewed the third and fourth steps against him. We rejected this same argument in *Davis*, 794 P.2d at 188–89; recently reaffirmed this holding in *Dunlap*, 975 P.2d at 747–49; and see no reason to revisit the issue now.

20. **Whether the instruction on the "committing the offense in an especially heinous, cruel, or depraved manner" aggravating factor was error.**

Sentencing Phase Instruction No. 6 provided, in part:

3. (a) The defendant,

(b) committed the offense in an especially heinous, cruel or depraved manner as this phrase is defined in Instruction No. 8.

Sentencing Phase Instruction No. 8 stated that "[t]he term 'heinous, cruel or depraved,' as used in Sentencing Phase Instruction No. 6, means conscienceless or pitiless, and unnecessarily torturous to the victim." Without a proper limiting instruction, the (5)(j) aggravator would violate the Eighth Amendment. *See Rodriguez*, 794 P.2d at 982–83; *Davis*, 794 P.2d at 176 (citing *Maynard v. Cartwright*, 486 U.S. 356, 364, 108 S.Ct. 1853,

100 L.Ed.2d 372 (1988) and *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398, (1980)). However, we have held that an instruction like Sentencing Phase Instruction No. 8 constitutes a proper limiting instruction. *See Davis*, 794 P.2d at 176–77.

Harlan also argues that Sentencing Phase Instruction No. 10 improperly limited the jurors' consideration of circumstances that occurred after Maloney's death to prove the *nonexistence* of any statutory aggravator. Sentencing Phase Instruction No. 10 provided:

In determining whether the prosecution has proven the aggravating factor defined in Instruction No. 6, you cannot consider any of the circumstances or facts occurring after Rhonda Maloney's death. Such circumstances cannot be considered by you in determining whether the prosecution has proven beyond a reasonable doubt that this aggravating factor exists.

Sentencing Phase Instruction No. 6 contained all of the aggravating factors submitted to the jury. Sentencing Phase Instruction No. 10 embodied this court's holding in *White*, 870 P.2d at 448, that the events occurring a day after the victim's death could not be considered by the sentencing body in determining whether the prosecution had proved the existence of the (5)(j) aggravator. We conclude that there was no substantial likelihood that the jury would have construed the challenged instruction to limit its consideration of evidence tending to prove an aggravator's nonexistence. *See Davis*, 794 P.2d at 192–93.

21. **Whether the trial court should have instructed the jury that: (a) there is a presumption that mitigation outweighed the aggravating factors; (b) there is a presumption that life is the appropriate punishment; and (c) the prosecution bears the burden of persuasion at the third and fourth steps of the sentencing process.**

First, we held in *Tenneson*, 788 P.2d at 797–98, that although it was within the trial court's discretion to refer to a presumption of life imprisonment in a sentencing instruction

in a death-penalty case, the giving of such an instruction is "ill-advised" and the "better practice is to avoid the use of that term." We adhere to that view.

Harlan's second point is that *White*, 870 P.2d at 455–56, was wrongly decided. In *White*, we held that the prosecution did not bear a traditional burden of persuasion at the third and fourth sentencing steps. *See* 870 P.2d at 455–56. Rather, in the third step, the sentencer must be convinced beyond a reasonable doubt that the mitigating factors do not outweigh the aggravating factors. *See id.* In the fourth step, the sentencer must be convinced beyond a reasonable doubt that death is the appropriate penalty. *See id.* at 456. We did not place a burden of persuasion on either party. *See id.* We adhere to our precedent and conclude that the trial court properly refused to instruct the jury about any burden of persuasion at the third and fourth steps of the sentencing process.

### 22. Whether the trial court's definition of "mitigating" was error.

Harlan objected to Sentencing Phase Instruction No. 12 defining mitigation as "any abatement or diminution of a penalty imposed by law." According to Harlan, if death is the "penalty imposed by law," then there must be a presumption that death is the appropriate sentence and there must be a burden on him to persuade the jury not to impose death. While the challenged instruction is not a model, we conclude that there is no reasonable likelihood that the jurors would have read it in a constitutionally improper way. *See Boyde v. California*, 494 U.S. 370, 380–81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Rodriguez*, 794 P.2d at 981. Read together with the other instructions in the penalty phase, which put the burden of persuasion in the first step on the prosecution, not the defendant, and did not impose a burden of persuasion on either party in the second through fourth steps, the court's definition of mitigation, if error, was harmless beyond a reasonable doubt.

### 23. Whether the jury was required to conclude affirmatively that mitigating factors outweighed aggravating factors.

The defendant asserts that the trial court's instructions improperly required the jury to conclude affirmatively that mitigation outweighed the aggravating factors before they could return a verdict of a life sentence.

The relevant instruction read as follows:

Your deliberations during this [third] step of the proceedings can lead to one of two results:

A. If one or more of the jurors *believe* that a mitigating factor or factors outweigh the aggravating factor or factors found to exist, then the jury shall enter a verdict of life imprisonment.

B. Only if the jurors are unanimously convinced beyond a reasonable doubt, that the mitigating factors do not outweigh the aggravating factors, then you shall continue your deliberations in accordance with these instructions.

Sentencing Phase Instruction No. [no number specified] (emphasis added). The prosecution concedes that there is no legal basis for requiring a juror to believe that mitigating factors outweigh aggravating factors, as alternative "A" arguably implies, before a verdict of life imprisonment may be entered. Nor are "A" and "B" the only possible results of the jurors' deliberations at the third step. However, alternative "B" is a correct statement of the law. Read together with "A," we conclude that there is no reasonable likelihood that the jurors would have read it in a constitutionally improper way. *See Boyde*, 494 U.S. at 380–81, 110 S.Ct. 1190; *Rodriguez*, 794 P.2d at 981.

### 24. Whether the instructions and the verdict form imposed a burden on the defendant to show why the death penalty should not be returned.

Sentencing Phase Instruction No. 18 provided, in part:

Before imposing a death sentence, you must be unanimously convinced, beyond a reasonable doubt, that death, rather than life, is the appropriate penalty for the defendant. This consideration involves a pro-

cess in which you must apply your reasoned judgment in deciding **whether the situation calls for life imprisonment** or the imposition of the death penalty. If you are not unanimously convinced, beyond a reasonable doubt, that death is the appropriate penalty, then the sentence must be to life imprisonment.

Regardless of the findings you have made in steps one, two and three of your deliberations, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation.

Your deliberations in this final step can lead to one of the three following results:

A. If all jurors are unanimously convinced, beyond a reasonable doubt, that death is the appropriate punishment in this case, then you shall return a verdict imposing a sentence of death.

**B. If all jurors are unanimously convinced that life imprisonment is the appropriate penalty in this case, then you shall return a verdict imposing a sentence of life imprisonment.**

**C. If all jurors cannot unanimously agree upon the appropriate punishment,** then the foreperson of the jury shall so report to the court. The court will then discharge the jury and impose a sentence of life imprisonment.

(Boldface and underlining added.) Harlan challenges the parts in boldface. If considered in isolation, the instructions in bold can be read to impose a burden on the defendant to convince the jury that life is the appropriate punishment. When read together with the correct statements of the law that are underlined, however, the incorrect statements are rendered harmless and the ambiguous statements take on the proper meaning. In addition, the verdict forms provided:

I. We, the jury, UNANIMOUSLY FIND that LIFE IMPRISONMENT is the appropriate punishment in this case.

II. We, the jury, CANNOT UNANIMOUSLY AGREE upon the appropriate punishment in this case. The jury under-

stands that the Court will impose a sentence of LIFE IMPRISONMENT.

III. We, the jury, UNANIMOUSLY FIND, beyond a reasonable doubt, that DEATH is the appropriate punishment in this case and that such punishment shall be imposed.

There were no other choices. To decide on choice III, as the jury did, the jury had to find unanimously that death was the appropriate punishment beyond a reasonable doubt. We conclude that any errors in Sentencing Phase Instruction No. 18 were harmless beyond a reasonable doubt.

**25. Whether the instruction that required that all verdicts at the sentencing phase be unanimous was error.**

Sentencing Phase Instruction No. 37 provided, in part:

> The verdicts must represent the considered judgment of each juror.
>
> . . . .
>
> You will be provided with three verdict forms which may contain several parts. *When you have agreed upon your verdicts,* the foreperson shall complete the forms in the manner that reflects your verdicts. . . .

(Emphasis supplied by Harlan.) The defendant asserts that the emphasized language imposed a requirement of unanimity upon the jurors before the jury itself could impose a sentence of life imprisonment. This proposition is true. But this requirement does not require that the jurors must be unanimous before the defendant may be sentenced to life imprisonment. The trial court would have imposed a sentence of life imprisonment if the jurors could not unanimously agree on the defendant's sentence. Thus, no error is shown. *See Boyde,* 494 U.S. at 381, 110 S.Ct. 1190.

**26. Whether the instruction that the jury "shall" return a sentence of death if convinced that death is the appropriate sentence was error.**

The challenged part of Sentencing Phase Instruction No. 18 states: "Your deliberations in this final step can lead to one of the three following results: A. If all jurors are unanimously convinced, beyond a reasonable

doubt, that death is the appropriate punishment in this case then you *shall* return a verdict imposing a sentence of death." (Emphasis added.) The use of the word "shall" does not result in an invalid mandatory sentencing scheme. The jurors were not prevented from considering and giving effect to any or all mitigating evidence. *See Boyde,* 494 U.S. at 377, 110 S.Ct. 1190; *Blystone,* 494 U.S. at 305, 110 S.Ct. 1078. The jurors could return a verdict of death only if all of them were convinced, beyond a reasonable doubt, that death was the appropriate punishment. If they were not, the verdict forms clearly provided that Harlan would be sentenced to life. We conclude, therefore, that the "shall return" language of Sentencing Phase Instruction No. 18 did not unconstitutionally prevent "individualized assessment" by the jury. *See Boyde,* 494 U.S. at 377, 110 S.Ct. 1190.

**27. Whether the trial court erred when it refused to instruct the jurors that the fourth step of the sentencing process was separate, independent, and distinct from their decisions at the third step.**

The defendant claims that the court erred in refusing the following proposed instruction regarding the fourth step:

> This final moral assessment [at the fourth step] is separate and distinct from the weighing of any aggravating factor or factors against mitigating factors. In making this decision, none of you should be influenced in the least by any decision by any of you that the state has convinced you beyond any reasonable doubt that mitigating factors do not outweigh the aggravating factors.

Harlan also submitted a second proposed instruction virtually identical to the one above. The trial court properly refused to give Harlan's instructions because they were inconsistent with the sentencing statute in effect at the time of the defendant's trial, section 16–11–103(2)(a), 8A C.R.S. (1986 & 1994 Supp.), which provided:

> (2)(a) After hearing all the evidence and arguments of the prosecuting attorney and

the defendant, the jury shall deliberate and render a verdict based upon the following considerations:

> (I) Whether at least one aggravating factor has been proved as enumerated in subsection (5) of this section;

> (II) Whether sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist; and

> *(III) Based on the considerations in subparagraphs (I) and (II) of this paragraph (a), whether the defendant should be sentenced to death or life imprisonment.*

(Emphasis added.) The fourth step, which is emphasized above, is not insulated from the jury's findings in steps one through three.

**28. Whether there was cumulative error and prosecutorial misconduct that requires reversal of the defendant's death sentence.**

Harlan alleges that the prosecutor committed misconduct when he: (1) implied that defense counsel was misleading the jury by presenting evidence regarding conditions of confinement at the Colorado State Penitentiary; (2) commented upon Harlan's failure to show any remorse for his actions until ten months after the rape and murder; (3) turned mitigation evidence into reasons to impose the death penalty by arguing that Harlan caused his family pain by making them come to court and beg for his life; (4) recalled Colleen Harlan's testimony regarding Harlan's statement about driving around at night looking for women he could rape and kill; (5) made paternalistic and sexist remarks concerning the danger Harlan might pose to women guards at correctional facilities; (6) suggested to the jury that the death sentence should be based upon deterrence, retribution, and notions of evil; (7) asked the jury to review the post-mortem photographs of Maloney, thereby urging them to make a decision based on their emotions; and (8) denigrated Harlan's mitigation evidence.

Based upon our review of the record, we find that each of the asserted instances of prosecutorial misconduct were comments or arguments made within the scope of the evidence presented, within the prosecution's proper role as an advocate, or were other-

wise insufficient to warrant a mistrial or reversal. *See Rodriguez,* 794 P.2d at 975; *see also Davis,* 794 P.2d at 200.

Harlan also claims that the prosecution attempted to elicit improper testimony and that several sentencing phase claims of error already discussed constitute cumulative error. Our review of the record establishes the prosecution's attempts to elicit testimony either were proper or do not warrant a reversal. Moreover, we reject his argument that the sentencing phase claims of error we already have rejected independently constitute cumulative error that rendered his trial fundamentally unfair.

### D. Miscellaneous Issues

**1. Whether the trial court erred when it ruled that statements the defendant made during a court ordered psychiatric examination, or the fact of his non-cooperation, could be used against him at the sentencing phase.**

The trial court ruled that any statements that Harlan made during a court ordered psychiatric examination pursuant to section 16–8–106, 6 C.R.S. (1999), could be used against him during the sentencing phase of the trial, if one became necessary. The court also ruled that if he did not cooperate during the court-ordered examination, such non-cooperation could be used against him during the sentencing phase. He argues that section 16–8–107, 6 C.R.S. (1999), does not authorize the use of his statements, or of his non-cooperation, during sentencing, and that construing the statute to make it apply at sentencing would be unconstitutional. Because Harlan never raised an insanity or impaired mental condition defense, the trial court did not order a psychiatric examination. Therefore, he does not have standing to challenge either the constitutionality or the trial court's interpretation of sections 16–8–106 or 16–8–107. *See People v. Fuller,* 791 P.2d 702, 709 (Colo.1990).

**2. Whether the enactment of Colorado's death penalty statute was valid.**

Harlan challenges the validity of the 1991 enactment of section 16–11–103 under article

IV, section 9 of the Colorado Constitution, which confines the scope of legislation enacted following a governor's proclamation convening an extraordinary session of the legislature to matters "specially named in the proclamation." Colo. Const. art. IV, § 9; *see Wieder v. People,* 722 P.2d 396, 398 (Colo. 1986). We conclude that the reenactment of section 16–11–103 bore a rational relationship to Governor Romer's proclamation to the General Assembly to consider the death penalty statute in light of judicial decisions that had rendered it inoperable. *See Dunlap,* 975 P.2d at 736 n. 4; *People v. Young,* 814 P.2d 834, 846–47 (Colo.1991).

**3. Whether the defendant's statements were involuntary and should have been suppressed.**

Following his arrest, Harlan was interrogated for about eight-and-one-half hours at the Thornton Police Station. Granting Harlan's motion to suppress in part, the trial court suppressed statements that Harlan made (1) before he waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and (2) after he invoked his right to counsel. The incriminating statements that the trial court admitted into evidence occurred in the first four hours of the interrogation. Harlan asserts that these statements were involuntary and therefore not admissible against him. *See People v. McIntyre,* 789 P.2d 1108, 1110 (Colo.1990). However, a defendant's inculpatory statement is involuntary only "if coercive governmental conduct played a significant role in inducing the statement." *People v. Gennings,* 808 P.2d 839, 843 (Colo.1991); *see also Colorado v. Connelly,* 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Our review of the videotape of those portions of the interrogation that occurred before Harlan invoked his right to counsel, convinces us that the trial court correctly found that the inculpatory statements admitted into evidence were not the product of police coercion, and were, therefore, voluntary in the constitutional sense.

### 4. Whether evidence obtained from the searches of the defendant's house, car, body, and telephone toll records should have been suppressed.

Harlan asserts that the trial court should have suppressed certain evidence obtained through the search of his home, car, telephone records, and through nontestimonial samples of his blood, saliva, body hair, and pubic hair. Specifically, he claims that the search warrants and the order for nontestimonial samples were not supported by probable cause, and that the evidence seized was not within the scope of the search warrants.

First, we conclude that the searches of the defendant's home and of his car were based on valid search warrants supported by probable cause, as required by the Fourth Amendment and article II, section 7 of the Colorado Constitution. The items that the police seized that were not within the scope of the warrants were legally seized under the plain-view seizure doctrine. These items were found while the police were conducting a legitimate search and their incriminating nature was immediately apparent. *See Horton v. California*, 496 U.S. 128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *People v. Najjar*, 984 P.2d 592, 596–97 (Colo.1999). The search of the telephone records of Harlan's cellular phone, which appeared to have blood on it and was legally seized under the plain-view doctrine, was also based on a search warrant supported by probable cause.

Second, the search of Harlan's body for nontestimonial evidence was supported by probable cause. Crim. P. 16(II)(a)(1) provides that, after judicial proceedings have been initiated, the court may require the defendant to give any nontestimonial identification as provided in Crim. P. 41.1(h)(2). When the trial court signed the order allowing the prosecution to seize samples of Harlan's blood, saliva, body hair, and pubic hair, there was probable cause to believe that Harlan had abducted, raped, and murdered Rhonda Maloney, as the affidavit attached to the prosecution's request revealed. Maloney's body had been found and an autopsy performed on it. Trace evidence from the defendant's house and car, as well as trace evidence found on the victim's body, demonstrated that the results of the nontestimonial identification procedures would be of material aid in determining whether the defendant committed the offense. *See* Crim. P. 41.1(c)(3). The seizure of these items satisfied constitutional limitations as well as the requirements of Crim. P. 16(II)(a)(1) and 41.1.

### 5. Whether the trial court should have conducted an evidentiary hearing to determine whether the marital privilege should bar Colleen Harlan's testimony.

Harlan objected to the admission, during the sentencing phase, of Colleen Harlan's testimony that he had told her that he had tried to kill her in an automobile accident before they were married. The marriage between the defendant and Colleen Harlan had been dissolved before the trial. The question was whether they were still technically married when the defendant stated he had tried to kill Colleen Harlan. *See* § 13–90–107(1)(a)(I), 5 C.R.S. (1999). However, "[t]he burden of proving the existence of a marriage for the purposes of this paragraph (a) shall be on the party asserting the claim." § 13–90–107(1)(a)(IV). Harlan failed to make an offer of proof that the comment occurred during the course of the marriage, and Colleen Harlan testified that she could not remember whether the communication occurred before or after the dissolution became final. Because Harlan failed to make a prima facie showing that the marital privilege existed, an evidentiary hearing was unnecessary, and Colleen Harlan's testimony was properly admitted.

### 6. Whether Harlan's motions to recuse the trial judge should have been granted.

Harlan filed two motions to disqualify the trial judge, both alleging that the judge was biased towards the prosecution and against the defense. *See* § 16–6–201(1)(d), 6 C.R.S. (1999); Crim. P. 21(b)(1)(IV). According to Harlan, the factual basis of both motions was that various trial court rulings on legal issues favored the prosecution and disfavored the

defense. The trial judge found the allegations in the motions legally insufficient to require his disqualification. We agree. *See Rodriguez v. District Court,* 719 P.2d 699, 703 (Colo.1986); *Altobella v. People,* 161 Colo. 177, 184–85, 420 P.2d 832, 836 (1966); *Walker v. People,* 126 Colo. 135, 147, 248 P.2d 287, 294 (1952).

**7. Whether the trial court should have held an evidentiary hearing to determine whether the prosecutor had a conflict of interest in the case.**

Allegations of sexual harassment that were made against the prosecutor did not involve this case or any of the participants in this matter. Because these circumstances could not give rise to a conflict of interest, the trial court did not err when it refused to hold an evidentiary hearing.

**8. Whether the trial court should have ordered disclosure of certain information and held a hearing on the proportionality of a death sentence in this case.**

Harlan contends that the trial court improperly failed to hold a hearing concerning the proportionality of imposing a death sentence on him as compared to sentences received by other defendants in this state that were convicted of the same crimes. We rejected the same claim in *Davis,* 794 P.2d at 173–74, holding that neither our state constitution nor section 16–11–103 required such review. *See also Pulley v. Harris,* 465 U.S. 37, 43–44, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

**9. Whether this court violated due process by requiring the filing of the opening brief when defense counsel asserted that they did not yet have a complete and accurate record of the case.**

Harlan asserts that numerous, but unspecified, "documents, exhibits, and transcripts" had not yet been made part of the record when he was required to file an opening brief. "[T]o obtain relief on a due process claim arising from an incomplete record, a defendant must *always* demonstrate specific prejudice resulting from the state of the record." *People v. Rodriguez,* 914 P.2d 230, 301 (Colo.1996) (emphasis in original). Harlan has not demonstrated any specific prejudice.